UNITED STATES of America,
Plaintiff-Appellee,

v.

William H. ANDREW, Jr.,
Defendant-Appellant.

No. 80–2275.

United States Court of Appeals,
Fifth Circuit.

Feb. 1, 1982.

Rehearing Denied March 2, 1982.

Gerald M. Birnberg, Houston, Tex., court appointed, for defendant-appellant.

James R. Gough, Asst. U. S. Atty., Houston, Tex., for plaintiff-appellee.

Before GARZA and RANDALL, Circuit Judges.*

GARZA, Circuit Judge:

Doctor William Harvey Andrew is here appealing his conviction on six counts for knowingly, intentionally and unlawfully dispensing dilaudid[1] and preludin,[2] not in the usual course of professional practice for a legitimate medical purpose.[3]  For the reasons set forth in the opinion below, we affirm.

Sometime in mid-1978, Cooper John ("Doc") Jones, a drug pusher, was contacted by a pharmacist who informed him that appellant, Dr. Andrew, wanted to see him. At that time Andrew was a physician practicing in Humble, Texas.  Jones met with Andrew and shortly thereafter the two of them began "doing business together."  In this confederacy, Jones would get the names, drivers' license numbers, dates of birth and approximate weight and height from the different people who wanted preludin and dilaudid prescriptions.  This data would be relayed to Andrew who would then write prescriptions ("scripts") against the names.  Jones would pay the doctor $30 for a preludin prescription of 60 tablets, and $250 for a dilaudid prescription of 100 tablets.

On January 26, 1979, Jones was arrested by special agents Mathis and Brooks of the United States Drug Enforcement Agency just after he had obtained some dilaudid using an Andrew "script."  Jones was charged with the state offense of unlawful possession of dilaudid.  Subsequently, Jones was also indicted in four other independent federal drug cases.  Thereupon, Jones agreed to cooperate with the government in making a case against Andrew.

On April 11, 1979, Jones took Agent Mathis to Andrew's office in Humble. Mathis was introduced to Andrew as "Jesse Davis."  Jones told Andrew that Mathis was working with him and would be coming to pick up prescriptions from the doctor. Andrew responded that it was "okay."  Andrew then asked Jones whether he was experiencing any difficulty in getting the prescriptions at the pharmacies.  When

---

* Due to his death on December 22, 1981, Judge Ainsworth did not participate in this decision. The case is being decided by a quorum.  28 U.S.C. § 46(d).

1. Dilaudid is a Schedule II non-narcotic controlled substance which is usually prescribed for severe pain.

2. Preludin is a Schedule II non-narcotic controlled substance which is primarily prescribed as an appetite suppressant in connection with weight reduction or medical diet programs.

3. Such conduct is violative of 21 U.S.C. § 841(a)(1) (1976), 21 C.F.R. § 1306.04(a) (1981), and 18 U.S.C. § 2(b) (1976).

Jones answered in the affirmative, Andrew suggested that they try a pharmacy in Port Arthur. Andrew also suggested that it would be better to have the people who cashed the prescriptions wear neck braces in order to appear to be in pain. Andrew and Jones also talked about the ambenyl syrup[4] business, in which Andrew was involved, and Andrew mentioned the difficulty he was experiencing in finding a suitable bottle cap.

After discussing ambenyl syrup, Jones turned to Mathis and asked him how many prescriptions he needed and for what drug. Mathis' response was that he needed two prescriptions for dilaudid. Jones gave Andrew a piece of paper containing the names and drivers' license numbers of two persons and said, "We want two dilaudid prescriptions." Without any hesitation and without any inquiry about the persons named in the paper, Andrew took out his prescription pad and wrote down two prescriptions for that drug. Jones then took $200 from Mathis and gave it to Andrew. The total cost of the two prescriptions was $500, at the rate of $250 per 100 tablet prescription. The remaining $300 balance was later paid by Jones to Andrew. On Jones' suggestion, Andrew also gave Mathis a preludin prescription without giving him any physical examination; the regular charge of $30 was waived.

On April 26, 1979, Mathis again went to Andrew's office, but this time he went alone. Andrew, without any prompting on Mathis' part, recognized him as Jesse Davis. Andrew asked Mathis how "business" was doing and also whether he had tried to get his prescriptions filled at the previously recommended Port Arthur pharmacy. Mathis then said to Andrew, "Doc, I'd like to get three of those D's scripts."[5] Andrew replied, "Okay," and taking the slip of paper from Mathis containing the names and license numbers of three individuals, wrote down three dilaudid prescriptions. Mathis then inquired what the cost of the prescriptions would be, to which Andrew replied,

"They will be $250 apiece." Mathis paid Andrew $750.

At trial, appellant's theory of defense was two-fold. First, the defense contended that at the time of the events in question, Andrew was suffering from a severe mental disorder, as a result of which he lacked substantial capacity to conform his conduct to the requirements of the law. Alternatively, if Andrew's condition was not so dire as to constitute legal insanity, he was at least so incapacitated that he had been "entrapped" into the commission of the offense by the government's agent, Cooper Jones. With respect to the insanity defense, both sides offered expert and lay witness testimony on the issue. As to entrapment, the appellant requested that an entrapment instruction be submitted to the jury, but the court refused to so instruct. The jury found Andrew guilty of all six counts of the indictment.

Four issues are asserted on this appeal: (1) whether the sanity of appellant was proven beyond a reasonable doubt; (2) whether the trial court's initial instructions regarding the insanity issue and its supplemental instructions concerning the burden of proof were adequate and sufficient; (3) whether the trial court properly refused an entrapment instruction; and (4) whether the trial court committed reversible error when it forbade defense counsel from asking before the jury the exact number of years Jones could have been sentenced. Each will be considered separately.

### The Insanity Defense

The first issue we are confronted with is one concerning the sufficiency of the evidence; i.e., whether the sanity of appellant was proved beyond a reasonable doubt. We find that it was.

Initially, the law presumes sanity. *United States v. Holt*, 450 F.2d 868, 869 (5th Cir. 1971); *Gordon v. United States*, 438 F.2d 858, 884 (5th Cir. 1971), *cert. denied*, 404 U.S. 828, 92 S.Ct. 139, 30 L.Ed.2d 56

4. Ambenyl syrup is a syrup containing codeine.

5. "D's" is slang for dilaudid.

(1971). That presumption vanishes, however, once the defendant introduces even slight evidence tending to prove his lack of capacity at the time of the offense. At that point the burden shifts to the government to prove beyond a reasonable doubt that such capacity existed. *E.g., United States v. Mota*, 598 F.2d 995, 999 (5th Cir. 1979), *cert. denied*, 444 U.S. 1084, 100 S.Ct. 1042, 62 L.Ed.2d 770 (1979); *United States v. Davis*, 592 F.2d 1325, 1329 (5th Cir. 1979), *cert. denied*, 442 U.S. 946, 99 S.Ct. 2894, 61 L.Ed.2d 318 (1979); *United States v. Iverson*, 588 F.2d 194, 196 (5th Cir. 1979); *United States v. Pilkington*, 583 F.2d 746, 747 (5th Cir. 1978), *cert. denied*, 440 U.S. 948, 99 S.Ct. 1427, 59 L.Ed.2d 637 (1978); *United States v. Fratus*, 530 F.2d 644, 648 (5th Cir. 1976), *cert. denied*, 429 U.S. 846, 97 S.Ct. 130, 50 L.Ed.2d 118 (1976); *United States v. Phillips*, 519 F.2d 48, 49 (5th Cir. 1975), *cert. denied*, 423 U.S. 1059, 96 S.Ct. 796, 46 L.Ed.2d 650 (1975); and *United States v. Milne*, 487 F.2d 1232, 1235 (5th Cir. 1973), *appeal after remand*, 498 F.2d 329 (5th Cir. 1974), *cert. denied*, 419 U.S. 1123, 95 S.Ct. 808, 42 L.Ed.2d 823 (1975).

The standard that this circuit has adopted for defining lack of mental capacity to commit a crime was set forth in *Blake v. United States*, 407 F.2d 908 (5th Cir. 1969) (en banc):

"(1) A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law. (2) As used in this Article, the terms 'mental disease or defect' do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct."

*Id.* at 916. There is no question that Andrew raised the issue of his sanity at the time of the offense. It was the government, then, that had the burden of proving beyond a reasonable doubt that he was sane at the time of the crime. As to achieving that goal, we have noted that

This Court, however, has never empirically defined the amount of evidence necessary to constitute "sufficiency" for purposes of submitting the issue of sanity to the jury, but instead has stated that each case must be decided on its own facts, and that the quantum and nature of proof the government must offer depends upon the quantum and nature of proof the defendant offers. *Nagell v. United States*, 392 F.2d 934, 937 (5th Cir. 1968).

*United States v. Fratus*, 530 F.2d at 648. Moreover, the jury's verdict must be sustained if, taking the view most favorable to the government, there is substantial evidence to uphold it. *Burks v. United States*, 437 U.S. 1, 16–18, 98 S.Ct. 2141, 2150, 57 L.Ed.2d 1, 13–14 (1978); *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); and *United States v. Pilkington*, 583 F.2d at 747.

When the basic issue before the appellate court concerns the sufficiency of the Government's proof of a defendant's sanity (as it did here), a reviewing court should be most wary of disturbing the jury verdict:

"There may be cases where the facts adduced as to the existence and impact of an accused's mental condition may be so overwhelming as to require a judge to conclude that no reasonable juror could entertain a reasonable doubt. But in view of the complicated nature of the decision to be made—intertwining moral, legal, and medical judgments—it will require an unusually strong showing to induce us to reverse a conviction because the judge left the critical issue of criminal responsibility with the jury." *King v. United States*, 125 U.S.App.D.C. 318, 324, 372 F.2d 383, 389 (1967) (footnote omitted).

*Burks v. United States*, 437 U.S. at 17 n.11, 98 S.Ct. at 2150 n.11.

Turning, then, to the evidence presented below we note that the jury heard extensive testimony on the question of Andrew's sanity. Both sides presented expert witnesses, and lay persons testified to Andrew's actions before, at, and after the time

of the offense. Andrew's first expert was Dr. Raphaeli, a psychologist, who had seen defendant and tested him on two separate occasions: (1) in January 1979, prior to his being licensed as a psychologist, he gave defendant some tests and interviewed him for a total of six to eight hours; and (2) in February 1980, he tested defendant for a total of eight hours. During direct examination, Dr. Raphaeli opined that Andrew had no control over his conduct, and that he was unable to understand the wrongfulness of his conduct. Dr. Raphaeli also testified that he could not know what defendant's condition was in April 1979, the time the alleged offenses were committed, but believed that Andrew's condition likely would not have changed. On cross examination, however, the witness shifted positions by indicating that defendant did know right from wrong at all times, and that he could control his actions depending upon the circumstances. Despite numerous attempts on defense counsel's part, Dr. Raphaeli refused to express an opinion on re-direct as to whether Andrew lacked substantial capacity to conform his conduct to the requirements of the law.

Doctor Covert, Andrew's second expert witness, was a psychiatrist who saw defendant briefly in December 1979, and tested and evaluated defendant for a total of fifty hours from January to April, 1980, in order to make a retrospective assessment of defendant's condition in April 1979. On the basis of the tests and interviews, Dr. Covert diagnosed defendant as suffering from mental illness, and as having schizo affective symptoms in April 1979. He further testified that defendant was extremely submissive and easily swayed by others. But when asked whether Andrew could substantially conform his conduct to the requirements of the law, Dr. Covert spoke in probabilities; i.e., that "[t]here is a high probability that he could not."[6]

The government's sole expert medical witness, Dr. Malev, a psychiatrist, examined defendant in January 1979, and then recommended that he be hospitalized for two weeks. At that time, Dr. Malev did no tests on Andrew, but he interviewed him for one hour and determined that psychological testing was necessary in order to determine if defendant suffered from a psychopathic disorder. At Dr. Malev's request, Dr. Raphaeli tested defendant while he was hospitalized. Dr. Malev testified that, in January 1979, Andrew was suffering from a severe personality disorder of long standing, severe depression and constriction of functioning. When Dr. Malev was asked whether defendant was unable to conform his conduct to the law at any time during 1979, he answered that he strongly suspected there were times when Andrew was unable to do so. He added that he knew defendant had been consuming alcohol and drugs,[7] which behavior is within one's control and which substances can induce aberrant behavior. When questioned in the form of a hypothetical outlining defendant's pattern of behavior from mid-1978 to mid-1979, with respect to acts alleged in the indictment, the witness responded that he believed that Andrew was pretty much in control of his actions during that time. Dr. Malev summarized his testimony by saying that he could not say with certainty that defendant either could or could not conform his conduct to the law at relevant times.

The defense's lay testimony concerning Andrew at the time of the alleged crimes consisted mainly of changes for the worse in appearance, together with memory loss. Doctor Raphaeli, however, admitted that some of the symptoms related by lay-witnesses appearing on appellant's behalf could be caused by Andrew's drug and alcohol abuse.

The Government's lay witnesses, Drug Enforcement Administration Agent Mathis and informant Jones, testified as to Andrew's condition on April 11 and 26, the

---

6.  Record, vol. 5, at 97.

7.  *Testimony from both defense and government witnesses indicate that Andrew was an* excessive user of drugs (consuming sizable quantities of anti-depressants) and alcohol. Record, vol. 5, at 13–14, 18–19, 22 and 250–51.

dates of the alleged criminal activity. Both testified that on April 11, appellant was very relaxed, was not depressed, did not appear nervous and did not display any fidgety motions. They further testified that he was coherent in his speech, clear in his thinking and did not display any sign of forgetfulness. Mathis also testified that when, on April 26, he met alone with Andrew, Andrew showed no distortions in his speech pattern, signs of depression or hysteria.

Finally, appellant claims that his defense of insanity was also buttressed by peculiarities associated with the criminal acts themselves. One peculiarity noted was the fact that Andrew failed to "check out" Agent Mathis before doing business with him. Another was that during their first meeting Andrew accepted only $200 for $500 worth of prescriptions. As to "checking out" Mathis, however, one could easily believe that this was one of Jones' responsibilities as part of drumming up new business. With respect to the missing $300, testimony indicates that it was later paid to Andrew by Jones. Moreover, it was also determined that it was Jones' usual practice to pay part of the money up front and the balance later on.

■ Viewing the evidence as a whole, in the light most favorable to the government, we find sufficient record support for the jury's determination of sanity at the time of the offense.

While the case law in this circuit which has developed and embellished the quantum of evidence sufficient to support a jury determination of sanity is extensive, the guidelines set out are not always clear. We thus must review carefully the precedent available to aid us in our determination.

The testimony of lay witnesses in opposition to psychiatric testimony has been held, in some instances, to be a sufficient basis for a jury finding of sanity. In a case factually similar to ours, this court has held that testimony of lay witnesses, specifically DEA agents, rebutting even uncontradicted testimony of an expert psychiatric witness, was sufficient, as a matter of law, to present a question to the jury. *United States v. Mota*, 598 F.2d 995, 998–1000 (5th Cir. 1979). The court stated:

> In the case before us, the DEA agents' testimony could lead to alternative conclusions: (1) [the defendant's] behavior appeared normal because his illness was in a state of remission, and thus he was not legally insane, or (2) [the defendant] was in an exacerbated psychotic state and thus insane although he did not so appear. Just as in *Hall*, the medical experts espoused the second alternative while the DEA agents adopted the first. Accordingly, it was the jury's duty to ascertain who was correct. We are convinced that "the evidence was not such that a reasonably minded juror must necessarily have had a reasonable doubt as to [the defendant's] legal sanity at the time of the offense. The case was properly submitted to the jury, and the jury's finding of guilt is supported by substantial evidence." *Id.*

598 F.2d at 1000. *See also, United States v. Hall*, 583 F.2d 1288 (5th Cir. 1978); *Mims v. United States*, 375 F.2d 135 (5th Cir. 1967). *But see United States v. Collier*, 453 F.2d 1173 (5th Cir. 1972) (ten lay witnesses supporting government's claim of sanity did not sufficiently, as a matter of law, rebut testimony of seven psychiatrists who had all concluded defendant was insane); *Brock v. United States*, 387 F.2d 254 (5th Cir. 1967) (testimony of three lay witnesses, only one of whom observed defendant at the time of the crime, insufficient to rebut testimony of one psychiatrist who, with the aid of a psychiatric hospital staff, extensively examined defendant after his criminal activity).

Additionally, when presented with both defense *and* government psychiatric testimony, this court has held that where there existed

> conflicting evidence on the defendant's ability to either appreciate the wrongfulness of his actions or to conform his conduct to the law, the issue of his sanity was properly submitted to the jury. *United States v. Kohlmann*, 491 F.2d 1250 (5th Cir. 1974).

United States v. Davis, 592 F.2d 1325 (5th Cir. 1979). See United States v. McCracken, 488 F.2d 406 (5th Cir. 1974) (conflicting expert testimony coupled with lay testimony supporting sanity sufficient to affirm jury verdict of sanity).

However, in some cases where the government has presented only inconclusive psychiatric testimony that the defendant was sane to rebut the defendant's own expert testimony of insanity, the evidence has been deemed insufficient. United States v. Bass, 490 F.2d 846 (5th Cir. 1974) (where defense and government both offered expert testimony, with defense psychiatrist opining insanity and government psychiatrist unable to express an opinion which negated defense testimony, evidence was insufficient to present a jury question on insanity). See United States v. Parks, 460 F.2d 736 (5th Cir. 1972) (government psychiatrist's testimony based on incorrect factual assumptions insufficient to support jury verdict in the face of testimony by two defense psychiatrists and five lay witnesses which established a strong case suggesting legal insanity).

Our task then is to analyze the testimony in this case in light of our prior decisions to determine the sufficiency of the evidence. We find that we are presented with expert government testimony (Dr. Malev) which does nothing to negate the defense testimony (Dr. Covert) that there was a high probability that Andrew was legally insane. If this testimony, buttressed by the defense lay testimony, were the only testimony, the case for sufficiency would be difficult to sustain.

We are presented, however, with the testimony of government lay witnesses who observed Andrew at the time of the crimes. Under this court's decisions in Mota, Hall and Mims, such testimony provides sufficient evidence, as a matter of law, to sustain the jury verdict. Even in the face of expert testimony that Andrew could have seemed normal while suffering legal insanity, the lay testimony asserting normal behavior is considered sufficient to present a jury question. United States v. Mota, 598 F.2d at 1000. Thus, in spite of equivocal expert testimony by the government, we are compelled to affirm the jury verdict of sanity.

### The Court's Supplemental Instructions to the Jury

During its deliberations, the jury sent a message to the court indicating that it was confused about the burden of proof on the sanity issue and requesting further instructions.[8] After conferring with counsel, the court directed the jury to review the entire charge, particularly Instruction No. 40 ("Insanity—defined").[9] The jury had a com-

---

**8.** That note reads as follows:

The jury understands that it is the burden of the prosecution to prove beyond a reasonable doubt that the defendant is guilty as charged of the counts contained in the indictment. Is it also the burden of the prosecution, given that a notice of reliance upon defense of insanity was filed with the court, to *disprove* the validity of the defendant's insanity plea beyond a reasonable doubt. Record, vol. 2, at 296–97.

**9.** The note sent back to the jury stated, "Please re-examine the entire charge and in particular re-read Instruction # 40 on the insanity defense." Record, vol. 2, at 297.

Instruction No. 40 reads as follows:
*Insanity—defined*

A person is not responsible for criminal conduct if, at the time of such conduct, as a result of mental disease or defect, he either lacked substantial capacity to appreciate the wrongfulness of his conduct or he lacked substantial capacity to conform his conduct to the requirements of law.

In order to determine whether the defendant, because of mental disease or defect, "lacked substantial capacity" as defined hereinabove, on the date of the alleged offenses, you may consider all of the evidence or circumstances surrounding the prescribing of the substance in question, any witnesses' testimony as to the mental condition of the defendant during the time the alleged offense was committed, any expert testimony as to the conditions or condition which defendant was or was not suffering from, and any other competent evidence bearing on whether the defendant was suffering from a mental disease or defect as defined above.

The sanity of the defendant at the time of an alleged offense must be established by the Government beyond a reasonable doubt because willful intent, as you have been instructed, is an essential element of the of-

plete copy of the charge in the deliberation room. Although appellant did not object to the instructions when given, defense counsel did object to the court's response to the jury's inquiry claiming it to be inadequate. Appellant argues that under the Supreme Court decision of *Bollenbach v. United States*, 326 U.S. 607, 612–13, 66 S.Ct. 402, 405, 90 L.Ed. 350 (1946), the district court committed reversible error in failing to clear up the jury's confusion with concrete accuracy. We disagree.

■■■ Generally speaking, "the necessity, extent, and character of any supplemental instructions to the jury are matters within the discretion of the district court." *United States v. Braverman*, 522 F.2d 218, 224 (7th Cir. 1975), *cert. denied*, 423 U.S. 985, 96 S.Ct. 392, 46 L.Ed.2d 302 (1975). *Accord, United States v. Collom*, 614 F.2d 624, 631 (9th Cir. 1979), *cert. denied*, 446 U.S. 923, 100 S.Ct. 1862, 64 L.Ed. 278 (1980); *United States v. Papia*, 560 F.2d 827, 843 (7th Cir. 1977); *United States v. Jackson*, 482 F.2d 1167, 1177 (10th Cir. 1973); *cert. denied*, 414 U.S. 1159, 94 S.Ct. 918, 39 L.Ed.2d 111 (1974); *United States v. Gordon*, 455 F.2d 398, 402 (8th Cir. 1972), *cert. denied*, 406 U.S. 970, 92 S.Ct. 2428, 32 L.Ed.2d 670 (1972); and *United States v. Wharton*, 433 F.2d 451, 454 n.9 (D.C.Cir. 1970). The district court acted well within its discretion in this case. The record indicates that the jury had a complete copy of the charge in the deliberation room. The entire charge clearly specified that the government had the burden of proof beyond a reasonable doubt on every element of the crimes charged. Instruction No. 40 clearly indicated that the government had the burden of proof beyond a reasonable doubt on the issue of appellant's sanity. The jury's note had not specifically asked for an explanation of Instruction No. 40. The emphasis placed on the word "disprove" by the jury indicated that the jury was unclear whether the government had to disprove defendant's case of insanity beyond a reasonable doubt. That there was

no further inquiry after the judge's response to the note also indicates that the judge's response cleared the jury's difficulty with concrete accuracy. In light of the above, we take the position that a judge may have the jury re-read portions of the original instructions provided the reinstruction does not mislead or confuse the jury. *See United States v. Cotton*, 646 F.2d 430, 434 (10th Cir. 1981); *United States v. Lang*, 644 F.2d 1232, 1239 (7th Cir. 1981); and *United States v. Castenada*, 555 F.2d 605, 611 (7th Cir. 1977), *cert. denied*, 434 U.S. 847, 98 S.Ct. 152, 54 L.Ed.2d 113 (1977). Accordingly, we find no reversible error.

### The Entrapment Issue

As earlier noted, appellant requested that the jury be instructed on the defense of entrapment; the trial court refused. Andrew now contends that such refusal constitutes reversible error since the jury's role as fact finder was essentially usurped by not permitting them to consider a valid defense.

■■■ We note at the outset that the mere assertion of entrapment does not require the trial judge to automatically instruct the jury on it. Defendant must first present evidence showing both (1) lack of his predisposition to commit the crime, and (2) some governmental involvement and inducement more than just providing an opportunity or facilities to commit the crime. *See e.g., United States v. Webster*, 606 F.2d 581, 583 (5th Cir. 1979); *United States v. Felts*, 497 F.2d 80, 81 (5th Cir. 1974), *cert. denied*, 419 U.S. 1051, 95 S.Ct. 628, 42 L.Ed.2d 646 (1974); *Pierce v. United States*, 414 F.2d 163, 166 (5th Cir. 1969), *cert. denied*, 396 U.S. 960, 90 S.Ct. 435, 24 L.Ed.2d 425 (1969); and *United States v. Sherman*, 200 F.2d 880, 882 (2nd Cir. 1952) (Learned Hand). Just how much evidence is necessary to satisfy this burden is unclear. One school of thought presently espoused in this Circuit is that any amount of evidence, even though unsubstantial, gets the issue to the

---

fense charged, and a person who is insane is not capable of forming such intent.

Record, vol. 2, at 216.

jury.[10] The opposing viewpoint takes the position that in order to satisfy the burden, defendant must adduce substantial evidence; *i.e.*, more than just a smattering, more than a scintilla.[11] While a recent deci-

10. This theory, for the most part, grew out of the *Strauss—Perez* decisions. *Strauss v. United States*, 376 F.2d 416 (5th Cir. 1967); and *Perez v. United States*, 297 F.2d 12 (5th Cir. 1961). Its rationale was stated in *Strauss* as follows:

> We find no requirement that a requested charge encompass, in the trial judge's eyes, a believable or sensible defense. The judge is the law-giver. He decides whether the facts constituting the defense framed by the proposed charge, if believed by the jury, are legally sufficient to render the accused innocent. The jury is the fact-finder. If the trial judge evaluates or screens the evidence supporting a proposed defense, and upon such evaluation declines to charge on that defense, he dilutes the defendant's jury trial by removing the issue from the jury's consideration. In effect, the trial judge directs a verdict on that issue against the defendant. This is impermissible. *Bryan v. United States*, 5 Cir. 1967, 373 F.2d 403. The judge must, therefore, be cautious and unparsimonious in presenting to the jury all of the possible defenses which the jury may choose to believe. We hold that where the defendant's proposed charge presents, when properly framed, a valid defense, and where there has been some evidence relevant to that defense adduced at trial, then the trial judge may not refuse to charge on that defense.

> ... The jury did not have to believe the defenses, but it should have been given the opportunity. This is true even if the defense is fragile. A defendant cannot be short-changed nor his jury trial truncated by a failure to charge.

376 F.2d at 419.

*See, e.g., United States v. Parker*, 566 F.2d 1304, 1305 (5th Cir. 1978), *cert. denied*, 435 U.S. 956, 98 S.Ct. 1589, 55 L.Ed.2d 808 (1978); *United States v. Garcia*, 546 F.2d 613, 615 (5th Cir. 1977), *cert. denied*, 430 U.S. 958, 97 S.Ct. 1608, 51 L.Ed.2d 810, (1977); *United States v. Gomez-Rojas*, 507 F.2d 1213, 1218 (5th Cir. 1975), *cert. denied*, 423 U.S. 826, 96 S.Ct. 41, 46 L.Ed.2d 42 (1975); *United States v. McCann*, 465 F.2d 147, 161 (5th Cir. 1972), *cert. denied sub nom. Kelly v. United States*, 412 U.S. 927, 93 S.Ct. 2747, 37 L.Ed.2d 154 (1972); and *United States v. Young*, 464 F.2d 160, 164 (5th Cir. 1972).

11. This theory arose out of *Pierce v. United States*, 414 F.2d 163 (5th Cir. 1969). There it was noted that

> even in a criminal prosecution the fact that an issue, if controverted, is for the jury does not require the judge to submit it when a defendant is merely attempting to cloud the minds of the jurors with irrelevancies. There must first be evidence sufficient at least to raise the issue and justify its consideration.

> •   •   •   •   •

> There is dicta in some of our opinions that can be urged to suggest that the entrapment defense should go to the jury whenever there is some evidence of an initial approach by the government. See *Wall v. United States*, 5 Cir. 1933, 65 F.2d 993; *Accardi v. United States*, 5 Cir. 1958, 257 F.2d 168; *Park v. United States*, 5 Cir. 1960, 283 F.2d 253; *Walker v. United States*, 5 Cir. 1962, 301 F.2d 94; *Brainin v. United States*, 5 Cir. 1963, 314 F.2d 460, rehearing denied, 317 F.2d 69. When it first faced the issue squarely, however, this Circuit recently held that the entrapment issue need not be presented to the jury if the evidence does not sufficiently raise the issue. *Snowden v. United States*, 5 Cir. 1967, 384 F.2d 357. And this is the inevitable conclusion to be reached from the Supreme Court's statement in *Lopez v. United States*, 1963, 373 U.S. 427, 436, 83 S.Ct. 1381, 1386, 10 L.Ed.2d 462:

> > "Indeed, the paucity of the showing [of entrapment] might well have justified a refusal to instruct the jury at all on entrapment."

> We affirm the view implicitly adopted in *Snowden*. There is neither need nor reason for the trial judge to deal with the issue of entrapment differently from the way he handles any other issue. If there is any evidence in the record that, if believed by the jury, would show that the government's conduct created a substantial risk that the offense would be committed by a person other than one ready to commit it, then, as in all other cases involving questions of guilt or innocence, the jury must be permitted to resolve the matter. If the record as a whole is devoid of such evidence, astute defense counsel may not invite confusion of the jury by seeking charges on this or on any other problem not presented by the case before the court. The court should charge the jury only on issues properly before it; it is not appropriate to convert the charge into a treatise on criminal law.

414 F.2d at 166–68.

*See, e.g., United States v. Gonzales*, 606 F.2d 70, 75 (5th Cir. 1979); *United States v. Wolffs*, 594 F.2d 77, 80 (5th Cir. 1979); *United States v. Buckley*, 586 F.2d 498, 501 (5th Cir. 1978), *cert. denied*, 440 U.S. 982, 99 S.Ct. 1792, 60 L.Ed.2d 242 (1978); *United States v. Timberlake*, 559 F.2d 1375, 1379 (5th Cir. 1977); *United States v. Benavidez*, 558 F.2d 308, 310 (5th Cir. 1977); *United States v. Heathington*, 545 F.2d 972, 973 (5th Cir. 1977); *United States v. Harper*, 505 F.2d 924, 926 (5th Cir. 1974); *United States v.*

sion of this court has indicated that these semantic discrepancies have failed to produce disparate results,[12] we find that under either theory Andrew has failed to sustain the burden.

■ Considering first the predisposition prong of entrapment, we note that it was appellant who first sought out Cooper Jones in order to engage in the unlawful business of prescribing drugs for other than legitimate medical purposes. This "business" had been ongoing for some time prior to the "turning" by the DEA of Cooper Jones. Moreover, Andrew's actions were clearly motivated by the monetary aspects of the transaction.

With respect to the second prong, the record indicates that at both meetings no pressure was applied, nor did appellant hesitate. He willingly sold the prescriptions to Agent Mathis on their first encounter and even suggested pharmacies where his prescriptions would more likely be filled. On their second meeting Mathis did not even have to introduce himself for he was immediately recognized by Andrew on his own. The mere fact that the government provides the opportunities or facilities for the commission of an offense is not sufficient for entrapment; there must also be some inducement. *Sorrells v. United States*, 287 U.S. 435, 442, 53 S.Ct. 210, 212, 77 L.Ed. 413, 417 (1932); *United States v. Costello*, 483 F.2d 1366, 1367 (5th Cir. 1973). None exists here.

Upon an examination of the record, we conclude that appellant has failed to shoulder his initial burden. We therefore find that the trial court properly refused an entrapment instruction.

### The Confrontation Issue

As his final theory for reversal, Andrew contends that the trial court's refusal to allow him to question Jones about the number of years he could have been incarcerat-ed deprived him of his Sixth Amendment right to effective cross-examination by preventing him from impeaching Jones. This argument we also find unpersuasive.

During the cross-examination of Jones, defense counsel sought to elicit from him his knowledge of the total number of years he could have faced had he received the maximum punishment on the four pending federal drug indictments against him. At this point the government asked permission to approach the bench and requested that appellant be prohibited from referring to actual penalties for state and federal charges still pending for fear that it might cause a mistrial. The court ruled that defense counsel could argue as to the magnitude of what Jones might face as potential incarceration, but wanted counsel to refrain from using numbers. The trial court further gave appellant permission to ask Jones whether it was a substantial number of years that he was facing in state courts, but appellant chose not to pursue it.

■ It is well established that " '[c]ross-examination of a witness in matters pertinent to his credibility ought to be given the largest possible scope.' " *United States v. Mayer*, 556 F.2d 245, 248 (5th Cir. 1977) (quoting *United States v. Partin*, 493 F.2d 750, 763 (5th Cir. 1974), cert. denied, 434 U.S. 903, 98 S.Ct. 298, 54 L.Ed.2d 189 (1979)). However, it has also been firmly established in this circuit that the trial judge has discretionary authority to restrict the scope of cross-examination so long as defendant has been permitted as a matter of right sufficient cross-examination to satisfy the confrontation clause of the Sixth Amendment. *E.g., Greene v. Wainwright*, 634 F.2d 272, 275 (5th Cir. 1981); *United States v. Ramirez*, 622 F.2d 898, 899 (5th Cir. 1980); *United States v. Vasilios*, 598 F.2d 387, 389 (5th Cir. 1979), cert. denied, 444 U.S. 967, 100 S.Ct. 456, 62 L.Ed.2d 380 (1979); *United States v. Elliott*, 571 F.2d

---

*Sullivan*, 443 F.2d 813, 816 (5th Cir. 1969), cert. denied, 404 U.S. 861, 92 S.Ct. 163, 30 L.Ed.2d 105 (1969); *United States v. Groessel*, 440 F.2d 602, 606 (5th Cir. 1971), cert. denied, 403 U.S. 933, 91 S.Ct. 2263, 29 L.Ed.2d 713 (1971); and *Cullifer v. United States*, 413 F.2d 300, 301 (5th Cir. 1969).

12. *United States v. Hill*, 626 F.2d 1301, 1303–04 n.3 (5th Cir. 1980).

880, 908 (5th Cir. 1978), *cert. denied sub nom. Delph v. United States*, 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978); and *United States v. Bass*, 490 F.2d 846, 858 n.12 (5th Cir. 1974). We believe that the confrontation clause has been satisfied here for impeachment . of a witness comports with constitutional standards when defense counsel is allowed to

> expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness.

*Davis v. Alaska*, 415 U.S. 308, 318, 94 S.Ct. 1105, 1111, 39 L.Ed.2d 347 (1974). *See also United States v. Vasilios*, 598 F.2d at 389.

■■■ In the case at bar, appellant was permitted wide range in cross-examining Jones. Through questions, appellant demonstrated that certain of Jones' indictments had been dismissed and that he had received probation on another charge. Appellant elicited testimony from Jones pointing towards Jones' motivation in testifying, Jones' prior dealings with the law enforcement officials and the possibility of his desire to please them in exchange for favorable consideration on any pending charges against him, and the final disposition of the charges against him. At no time was appellant prohibited from showing Jones' motivation for testifying. Appellant was restricted only with regard to eliciting the maximum number of years of incarceration Jones faced.

In light of the overwhelming testimony appellant elicited which placed Jones in his proper setting, we conclude that the restriction on cross-examination imposed in the lower court did not rise to the level of interference with Andrew's Sixth Amendment rights.

AFFIRMED.