**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Curtis L. COLLINS, Defendant-Appellant.**

**No. 81–3662**
**Summary Calendar.**

United States Court of Appeals,
Fifth Circuit.

Oct. 15, 1982.

Rehearing Denied Nov. 12, 1982.

William F. Wessel, Court-Appointed, New Orleans, La., for defendant-appellant.

John Volz, U. S. Atty., Louis Moore, Jr., Michael Schatzow, Asst. U. S. Attys., New Orleans, La., for plaintiff-appellee.

Before GEE, RANDALL and TATE, Circuit Judges.

RANDALL, Circuit Judge:

Curtis Collins appeals his jury conviction for first degree murder and assault. He contends that his conviction should be reversed because (1) the government failed to prove him sane beyond a reasonable doubt; (2) there was insufficient evidence of premeditation to convict him of first degree murder; (3) the trial court erred in refusing to give an instruction to the jury on manslaughter as a lesser included offense; (4) the trial court abused its discretion in excluding testimony concerning defendant's mental state; and (5) prosecutorial comments concerning the result of a verdict of not guilty by reason of insanity prejudiced defendant at trial. For the reasons set forth below, we affirm.

## I. PROCEDURAL AND FACTUAL BACKGROUND.

Curtis Collins was indicted for first degree murder in violation of 18 U.S.C. § 1111(a)(b) (1976) and for assault in violation of 18 U.S.C. § 111 (1976).[1] At his arraignment he pled not guilty; he subsequently filed notice of a defense based on mental condition. The trial was continued after the defense filed a motion to have the defendant committed for a psychiatric examination. When the defendant returned from this evaluation, the court determined that Collins was competent to stand trial. At trial, a jury convicted Collins of first

1. The parties have stipulated that the crime took place within the special maritime and territorial jurisdiction of the United States.

degree murder and assault, after receiving instructions which included a charge concerning the lesser included offense of second degree murder. The court sentenced the defendant to life imprisonment on Count I and to a five year concurrent sentence on Count II.

The historical facts of this case are undisputed. On November 24, 1980, Curtis Collins entered the main post office in New Orleans, Louisiana and shot and killed Adrienne Wharton, an employee of the United States Postal Service, with a .30 caliber carbine. Collins, a probationary employee of the Post Office, believed that Wharton, a supervisor, was responsible for lowering his rating for an unexcused absence from work. He was afraid that he would probably lose his job as a result.

At trial, the government introduced two witnesses who saw Collins enter the building. Neither man saw a gun, but persons who met Collins inside the post office observed that he seemed to be concealing an automatic rifle. Collins questioned a number of people concerning Wharton's whereabouts and apparently argued with his immediate supervisor about the unsatisfactory rating. Shortly thereafter, Collins was seen to shoot Wharton repeatedly, emptying the clip of his carbine into her body after she was already obviously dead.

As he was fleeing the scene of the shooting, Collins confronted Robert L. Jones, a security guard employed by the Post Office. When Jones ordered Collins to stop, Collins fired his weapon at Jones, wounding him above his right eye.

There was conflicting testimony from both lay and expert witnesses at trial about whether the defendant was legally insane.

## II. SUFFICIENT EVIDENCE OF SANITY.

▪ Collins contended that he was insane when he committed the crime and that he was therefore absolved of criminal responsibility. Once the issue of insanity has been raised, the government has the burden of proving beyond a reasonable doubt that the defendant was sane at the time of the alleged crime. *United States v. Andrew,* 666 F.2d 915, 918 (5th Cir. 1982); *United States v. Davis,* 592 F.2d 1325, 1329 (5th Cir.), *cert. denied,* 442 U.S. 946, 99 S.Ct. 2894, 61 L.Ed.2d 318 (1979); *United States v. Fratus,* 530 F.2d 644, 648 (5th Cir.), *cert. denied,* 429 U.S. 846, 97 S.Ct. 130, 50 L.Ed.2d 118 (1976); *Brock v. United States,* 387 F.2d 254, 257 (5th Cir. 1967).

▪ This circuit has essentially adopted the American Law Institute standard for defining lack of mental capacity to commit a crime:

(1) A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law. (2) As used in this Article, the terms "mental disease or defect" do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct.

*Blake v. United States,* 407 F.2d 908, 916 (5th Cir. 1969) (en banc). An accused may, however, have a mental disorder of deficiency and still be mentally competent to be held legally responsible for his crime. *United States v. Kohlmann,* 491 F.2d 1250, 1252 (5th Cir. 1974).

▪ We have never defined the quantum of evidence necessary to constitute sufficiency for purposes of submitting the issue of sanity to the jury; instead, each case must be decided on its own facts, with careful attention to the weight of evidence presented on both sides. *Andrew, supra,* at 918; *Fratus, supra,* at 648. Where the evidence raises an issue as to the defendant's sanity at the time of the commission of the crime, the case is properly submitted to the jury, which is charged with assessing the criminal responsibility of the accused. *Kohlman, supra,* at 1252. We must uphold the jury verdict if, taking the view most favorable to the government, there is substantial evidence to support it, *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), and we must be

particularly wary of disturbing a jury verdict on the question of the defendant's sanity. *Burks v. United States,* 437 U.S. 1, 17 n. 11, 98 S.Ct. 2141, 2150 n. 11, 57 L.Ed.2d 1 (1978); *Andrews, supra,* at 918.

This case essentially involved a battle of the experts. The two government experts agreed that the defendant had serious psychological problems, but both testified that Collins' disturbed mental condition was not of such a magnitude as to make him legally insane. Dr. James R. Leach, Chief of Forensic Psychiatry at the United States Medical Center for Federal Prisoners, who testified as an expert in the field of psychiatry, observed defendant for several months and concluded that defendant was a paranoid personality, perhaps with antisocial tendencies. Dr. Leach made it clear, however, that this is not a psychosis. He testified that in his expert opinion the defendant, on November 4, 1980, was responsible for his conduct, knew right from wrong, and could conform his conduct to the requirements of the law.

Dr. Rene G. Culver, an expert in the field of psychiatry, interviewed the defendant twice. While Dr. Culver found that Collins exhibited various behavioral deficiencies and diagnosed him as an antisocial personality with paranoid traits, he testified that a psychotic person could still be criminally responsible for his conduct. Dr. Culver was also of the opinion that on November 4, 1980, the defendant appreciated the nature of the consequences of his actions and had substantial capacity to conform to the norms of society.

The defense relied on evidence of a battery of psychological tests performed by Dr. Charles Moan, a clinical psychologist, and on the opinions of the psychiatric experts, Drs. Gunther Perdigao and Marvin Miller, that Collins was not legally responsible for his actions on November 4, 1980. The doctors based their opinions in part on Collins' personal and family history of mental illness, his erratic work history, his previous attempts to take his own life, his reactions to the events leading up to Wharton's death and his beliefs regarding both the persecutions and sexual advances of Wharton.

In addition to the opinions of the medical experts, the defense introduced lay testimony from the defendant's wife and mother, and Caulfield, an attorney who had represented him on previous occasions. Each of them testified that before the murder, the defendant was acting nervous and agitated. The government introduced substantial evidence from lay witnesses describing Collins' conduct before, during, and after the murder on November 4, 1980, which indicated that the defendant was not acting abnormally. The defendant's friend, Daniel P. Patin, stated that the defendant appeared to be "uptight" about losing his job, but that he was coherent. Another postal employee, Louis L. Blossom, recalled that the defendant seemed normal when he saw him jogging by.

Medical personnel at the Pendleton Memorial Methodist Hospital, who treated Collins shortly after the shooting for a gunshot wound inflicted by Officer Jones, did not notice anything particularly unusual about his behavior. Technician Tuggle explained that the defendant appeared a little nervous and asked for a cigarette. Tuggle and Nurse Legendre testified that Collins stated that he had just killed his supervisor and that he had been shot by a security guard. Ms. Tuggle also stated that the defendant lucidly supplied the information required by the emergency room admission form, including his name, address, social security number, birthday, doctor's name, wife's name, insurance number and other information. Legendre recalled that the defendant appeared logical and oriented and that he was not ranting or raving.

Thus, the jury, in addition to psychiatric testimony, heard testimony of lay witnesses, who observed Collins at the time of the killing. Under our decisions in *United States v. Andrews,* 666 F.2d 915 (5th Cir. 1982) and *United States v. Davis,* 592 F.2d 1325 (5th Cir.), *cert. denied,* 442 U.S. 946, 99 S.Ct. 2894, 61 L.Ed.2d 318 (1979), such lay testimony, particularly when bolstered by the opinions of the government experts, provides sufficient evidence to sustain the

jury verdict. Accordingly, the evidence was not such that a reasonably minded juror must necessarily have had a reasonable doubt as to defendant's legal sanity at the time of the offense, and the jury's rejection of the defendant's insanity defense must be upheld.

## III. SUFFICIENT EVIDENCE OF PRE-MEDITATION.

■■■ Once again, in determining the sufficiency of the evidence of premeditation, we must view the evidence in the light most favorable to the government. *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942). The question of whether premeditation required for first degree murder was actually present must be determined by the jury, properly instructed by the court, from the facts and circumstances of the case. *United States v. Brown,* 518 F.2d 821, 826 (7th Cir.), *cert. denied,* 423 U.S. 917, 96 S.Ct. 225, 46 L.Ed.2d 146 (1975). Specifically, the Seventh Circuit held in *Brown* that although mental processes are subjective and cannot be proven directly, premeditation may be established by the facts and circumstances surrounding the killing. Here, the evidence supporting this finding was provided by lay witnesses who gave testimony similar to that considered dispositive in *Brown, supra,* at 828. The type of weapon which Collins used to kill his victim (an assault rifle with folding stock and two clips taped together, each containing 30 bullets) was not one which has innocent uses, nor is it one that the defendant would habitually carry with him. One witness saw the defendant carrying the butt of the concealed weapon to the scene of the killing just minutes before Collins shot his victim and other witnesses saw him bring it to the murder scene hidden in a u-cart.

There was other evidence supporting a finding of premeditation. The afternoon of the murder, the defendant, outside the post office, told a friend that he had to think about what he would do about his supervisor, the victim. Collins then entered the post office, mounted the flight of stairs that led directly to his victim's area of supervision, and literally stalked Wharton through the post office, repeatedly asking her whereabouts. He concealed the murder weapon as he sought his victim, first under a poncho and then in a u-cart. When he found his victim, Collins coolly took the murder weapon from the u-cart and began to fire. He then walked over to her obviously lifeless body, placed the gun against the victim's head, and fired again, blowing her brains out. In *Brown* the court viewed a similar "pause" between successive stabbings as evidence of an interval for reflection and second thought and also as evidence that the killing was not merely the result of persistence of an initial impulse or passion. 518 F.2d at 828.

The defendant relies on *Hemphill v. United States,* 402 F.2d 187 (D.C. Cir. 1968), and *Austin v. United States,* 382 F.2d 129 (D.C. Cir. 1967), for his contention that the nature of the murder weapon and the brutality of the killing are insufficient evidence of premeditation. He emphasizes, as did the court in the cases cited above, that a particularly brutal murder may be as indicative of senseless frenzy as it is of deliberation. In both *Hemphill* and *Austin,* the court pointed out that there was no evidence that the weapons involved (a hammer and a pocket knife) were not available as a matter of course. In *Belton v. United States,* 382 F.2d 150 (D.C. Cir. 1967), the same court found the use of a revolver brought into the home by the defendant to be significant. Further, the evidence regarding the manner of killing, i.e., the repeated shooting of the victim, concerns the opportunity for deliberation, as well as the horror of the crime. Collins' stalking of his victim, use of a concealed rifle and repeated shooting of his victim, are certainly sufficient evidence of premeditation to support the jury verdict.

## IV. THE ADEQUACY OF THE JURY INSTRUCTION.

After hearing closing arguments and the trial court's instructions, which included a charge on the lesser included offense of second degree murder, the jury found the defendant guilty on both counts. The defendant does not contend that the instruc-

tions given were inadequate or misstated the law, but rather claims that the jury should have been charged on manslaughter as a lesser included offense.

The United States Supreme Court has held that a defendant is entitled to an instruction on a lesser included offense only if the evidence would permit a jury rationally to find him guilty of the lesser offense and acquit him of the greater. *Keeble v. United States,* 412 U.S. 205, 93 S.Ct. 1993, 36 L.Ed.2d 844 (1972). Such an instruction is proper only where the greater offense requires the finding of a disputed fact not required by the lesser. *Sansone v. United States,* 380 U.S. 343, 85 S.Ct. 1004, 13 L.Ed.2d 882 (1965); *United States v. Madden,* 525 F.2d 972 (5th Cir. 1976). We are unable to find any evidence in the record, however, which would support a conviction of the defendant for manslaughter.

The crime of manslaughter is defined in 18 U.S.C. 1112 (1976) as:

(a) Manslaughter is the unlawful killing of a human being without malice. It is of two kinds:

Voluntary—Upon a sudden quarrel or heat of passion.

Involuntary—In the commission of an unlawful act not amounting to a felony, or in the commission in an unlawful manner, or without due caution and circumspection, of a lawful act which might produce death.

The fact that distinguishes manslaughter from murder is the existence of malice. *Stevenson v. United States,* 162 U.S. 313, 16 S.Ct. 839, 40 L.Ed. 980 (1896). In the case of voluntary manslaughter, the onset of a "sudden passion" is deemed to demonstrate the absence of malice. *United States v. Elk,* 658 F.2d 644 (8th Cir. 1981). Collins requested the manslaughter charge on the grounds that he killed his victim out of a sense of "rage over the loss of his livelihood at the hands of Ms. Wharton." Defendant's brief at 13. A number of witnesses testi-

fied that Collins was angry about Wharton's causing his immediate supervisor to give him an unsatisfactory rating. Some witnesses also mentioned that the defendant believed that Wharton was harassing him and he seemed to think that she was sexually attracted to him.

None of this evidence amounts to provocation adequate to reduce a charge of murder to voluntary manslaughter. While the crime of manslaughter is in some sense "irrational" by definition in that it arises out of a person's passions, the provocation must be such as would arouse a reasonable and ordinary person to kill someone. *United States v. Chapman,* 615 F.2d 1294 (10th Cir.), *cert. denied,* 446 U.S. 967, 100 S.Ct. 2947, 64 L.Ed.2d 827 (1980); *see generally* W. LaFave & A. Scott, *Criminal Law* § 75 (1978). As the Eighth Circuit has explained, the jury must have reasonable grounds to conclude that

the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinary reasonable person to act rashly and without deliberation and reflection, and from such passion, rather than from judgment. 2 E. Devitt & C. Blackmar, Federal Jury Practice & Instructions § 41.14 (1977).

*United States v. Elk,* 658 F.2d 644 (8th Cir. 1981). The incidents described by defendant as the cause of his rage are not of the sort that would cause an ordinary, reasonable person to act rashly, without deliberation and from passion. Further, the evidence, as well as the jury verdict, indicates that the defendant calmly and deliberately killed his victim, rather than acting in the heat of passion.[2] Wharton changed the evaluation four days before she was murdered, allowing Collins ample time for his blood to cool and for reflection. The defendant's reliance on *United States v. Comer,* 421 F.2d 1149 (D.C. Cir. 1970), is misplaced, since that case involved adultery, which has often been considered adequate provocation.

---

2. · It has been suggested that a jury verdict of first degree murder, where the jury has been charged on both first and second-degree murder, indicates that the failure to give a manslaughter charge was harmless. The courts have reasoned that in these cases the jury has found not only malice, but deliberation, which is the antithesis of a crime of passion. *See United States v. Frady,* 456 U.S. 152, 170–72, 102 S.Ct. 1584, 1596, 71 L.Ed.2d 816 (1982).

■ While a defendant's request for a lesser included offense charge should be freely granted, there must be a rational basis for the lesser charge and it cannot serve merely as "a device for defendant to invoke the mercy-dispensing prerogative of the jury." *United States v. Sinclair,* 444 F.2d 888, 890 (D.C. Cir. 1971). While the trial judge cannot eliminate the jury's ability to disregard instructions and acquit on the basis of pure conjecture, he is not required to put the case to the jury on a basis that "essentially indulges and even encourages speculations." *Id.* The trial court painstakingly considered Collins' request in this case and rightfully concluded that if the defendant's anger over his supervisor's actions "were to justify a killing so as to reduce its gravamen from murder to manslaughter that it would be to so pervert the law as to be ludicrous." Record, Vol. IV, at 175.

## V. THE EXCLUSION OF TESTIMONY.

The defendant claims that the trial court improperly excluded certain testimony relevant to show his state of mind. For example, during its examination of Caulfield, the defense posed several vague and general questions concerning the defendant, his behavior, and his attitude. The government repeatedly objected on grounds of form and relevance. The court sustained these objections because this line of questioning did not invoke specific observations, involved a professional opinion as to mental competency, and related to a time period distant from the events at issue.

■ As a preliminary matter, it appears that the defendant did not properly preserve this error for appeal, since no offer of proof was made at trial. *United States v. Winkle,* 587 F.2d 705, 710 (5th Cir.), *cert. denied,* 444 U.S. 827, 100 S.Ct. 51, 62 L.Ed.2d 34 (1979). Although insisting that the evidence concerning the defendant's state of mind was relevant, the defendant's counsel failed to make any offer of proof of what the excluded testimony might be.

■ At any rate, a trial court has broad discretion in determining the admissibility of evidence based on relevance and materiality, and that determination will be overturned only when the abuse of that discretion is clearly shown from the record. *United States v. Ylda,* 643 F.2d 348, 353 (5th Cir. 1981). No abuse is evident here. The trial judge correctly limited the evidence received to that which was relevant and material to the issues before the court.

The defendant, moreover, was not prejudiced by the trial court's rulings since his witnesses were permitted to testify about their observations of the defendant's behavior during the time leading up to the killing. Caulfield recalled that he had "jokingly" told a third party that if "someone put Mr. Collins in a position where they would pressure him, that he was going to end up and kill someone." Record, Vol. III, at 238. The defendant's wife was allowed to testify extensively concerning her husband's behavior on the day before the murder:

He was crying, he stretched out on the floor crying. He laid on the bed. And the best way I could describe it is if you've seen a chicken jump with the head cut off, his body was jumping like—I guess you would say spasms and it was just the same thing, the spasms and the crying and crawling on the floor . . . .

Record, Vol. IV, at 20. Given the latitude of this testimony, the excluded testimony would have been cumulative, and its proper exclusion caused the defendant no prejudice.

## VI. IMPROPER STATEMENTS TO THE JURY.

■ The defendant contends that the government, in its objections to certain statements made by defendant's counsel, was permitted to hint to the jury that if it found Collins not guilty by reason of insanity, he would be set free. Relying on *United States v. McCracken,* 488 F.2d 406, 423–24 (5th Cir. 1974), the defendant maintains that such insinuations, even if correctly reflecting the state of the law, unfairly influenced the jury and denied him a fair trial on the issue of insanity.

At two points, during both his opening statement and his closing argument at trial,

the defense counsel misstated the law to the jury and in each instance the government objected. In his opening statement the defense counsel stated:

> *Mr. Wessel:* And I'm telling you and I'm asking you to look at the evidence that we put on, to look at it in terms of did he have the mental capacity to conform his conduct to the demands of society, number one; and if he did not . . . then *leave it up to the judge as to how he's to be treated or what's to happen to him at that point.*
>
> *Mr. Moore:* Your honor, we voice an objection to that. We would voice an objection to that particular statement, because leaving it to the Judge as to what will be determined to occur to defendant is not proper.
>
> *The Court:* That's correct.

Record, Vol. II, at 119–20 (emphasis added).

During his closing argument, the defense counsel himself initially referred to what would be done to the defendant if he were found not guilty by reason of insanity:

> *Mr. Wessel:* He must be intellectually rationally responsible in order for you to say he committed a crime, because that's what it's all about. *We don't hang crazy people. We don't put crazy people in jail. We put them in institutions, but we put—*
>
> *Mr. Moore:* Your honor, *I'm going to voice an objection as to what we do with crazy people. That's not so.*
>
> *The Court:* Objection is sustained.
>
> *Mr. Wessel:* In history, the law, you probably read about people—people in other countries, and that's what this country is about.
>
> *Mr. Moore:* Your honor, I'm going to voice the same objection. It's not what people do in other countries to crazy people.
>
> *The Court:* It is not what we do here, Mr. Wessel.
>
> *Mr. Moore:* Your honor, I ask for a curative instruction that the jury be given.

Record, Vol. V, at 50–51. (emphasis added).

A plain reading of the challenged interchange does not suggest by implication or otherwise that Collins would be turned loose if acquitted. There is no error that can be equated with the errors in *McCracken* or the cases cited therein. If the statements conveyed any message to the jury about the result of a verdict of not guilty by reason of insanity, the implications came from the defense counsel or were required responses to his misstatements of the law.

Furthermore, it appears that error, if any, would be subject to the "invited error doctrine": "A defendant cannot complain on appeal of alleged errors invited or induced by himself, particularly where, as here, it is not clear that the defendant was prejudiced thereby." *United States v. Lewis,* 524 F.2d 991, 992 (5th Cir. 1975), *cert. denied,* 425 U.S. 938, 96 S.Ct. 1673, 48 L.Ed.2d 180 (1976); *see also United States v. Martinez,* 604 F.2d 361, 366 (5th Cir. 1979), *cert. denied,* 444 U.S. 1034, 100 S.Ct. 708, 62 L.Ed.2d 671 (1980). Here, the objection, taken in context, was offered to correct an improper insinuation made by defense counsel.

Since we find no reversible error, the jury verdict is

AFFIRMED.