**UNITED STATES of America, Plaintiff–Appellee,**

v.

**James E. WAGNER, Defendant–Appellant.**

**No. 84–5176.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 7, 1987.

Decided Dec. 24, 1987.

---

Philip Deitch, Los Angeles, Cal., for defendant-appellant.

Laurie L. Levenson, Los Angeles, Cal., for plaintiff-appellee.

Before NELSON, HALL and THOMPSON, Circuit Judges.

NELSON, Circuit Judge:

James E. Wagner appeals his conviction for first degree murder and for conveyance of a weapon in a federal correctional institution. Wagner raises a number of challenges to the district court's rulings before and during his jury trial. We affirm.

## FACTUAL BACKGROUND

In 1978, Wagner was committed to the Federal Correctional Institution in Lompoc, California, to serve a fifteen-year sentence for bank robbery. In January, 1981, Wagner was placed in administrative segregation after a preliminary investigation indicated that he had stabbed to death another inmate, Thomas Sargis, on January 12, 1981. While in administrative segregation, Wagner stabbed to death a second inmate, David Austin, on August 2, 1981.

As a result of investigations into the Sargis and Austin homicides, Wagner was indicted on two counts of first degree murder, 18 U.S.C. § 1111 (1982), and on two counts of conveying a weapon in a federal institution, 18 U.S.C. § 1792 (1982). On August 1, 1983, the day before trial, the district court dismissed the two counts relating to the Sargis killing in light of this court's holding in *United States v. Gouveia*, 704 F.2d 1116 (9th Cir.1983) (en banc), *rev'd*, 467 U.S. 180, 104 S.Ct. 2292, 81 L.Ed.2d 146 (1984). Wagner was then tried before a jury on the two counts stemming from the Austin homicide.

The government's witnesses testified to the following account of Wagner's attack on Austin. While in administrative segregation, Wagner served as an inside orderly, cleaning floors and assisting with water and food distribution within his unit. Austin, a prison informant in protective custody, was working as an outside orderly in an adjacent unit separated from Wagner's unit by a metal grille. On August 2, 1981, at approximately 3:00 p.m., correctional officer Gary Berman instructed Austin to heat a pitcher of hot water for Wagner.

Austin placed the pitcher in a microwave oven and heated the water until it was boiling. Austin then placed the pitcher near the grille door and, at Berman's instruction, stepped back. When Berman unlocked and opened the grille door, Wagner crouched down to pick up the pitcher, then suddenly lunged forward and threw the boiling water in Austin's face. Austin screamed and tried to run away from Wagner in the direction away from the door. Wagner pursued Austin, pulling from his pants a prison-made knife.

Officer Berman apparently became caught in the door and was unable to stop Wagner. However, another correctional officer, Harold Harris, had witnessed the attack and intercepted Wagner as he chased Austin. Harris grabbed Wagner from behind and yelled at him to drop the knife, but Wagner refused to do so. As Harris and Wagner struggled, Austin apparently tried to reach safety by running around and in front of Wagner. Wagner lunged at Austin, and the three men piled into a corner wall. As Harris attempted to turn Wagner away from Austin, he heard Austin say, "He got me, Harris. It's real good." Wagner and Harris continued to struggle until another correctional officer arrived and assisted Harris in disarming Wagner. Austin subsequently died from massive hemorraging due to a single stab wound to the heart, caused by an underhand jab.

The government introduced additional testimony respecting Wagner's premeditation and motive. In response to Wagner's inquiry earlier in the day, correctional officer Jose Blanchard had informed Wagner that Blanchard's shift was over at 3:00 p.m. As Blanchard left the area at the end of his shift, he saw Wagner standing in the vicinity of the grille door with the hot water pitcher in his hand. Correctional officers testified that Wagner generally wore a type of slippers when working in the unit, but wore tennis shoes on this particular day. Even though it was August, Wagner had on a longsleeved fatigue jacket and admitted that he wore the jacket to conceal the knife. As noted earlier, Wagner's victim was a prison informant in protective custody.

Wagner testified on his own behalf, and his lawyer essentially led him through a version of the stabbing different from that presented by the government's witnesses. According to Wagner, Austin had reached for the hot water pitcher as if to throw it at him, but Wagner got to the pitcher first. Wagner admitted pulling the knife and running in Austin's direction, but denied that he intended to stab Austin. Officer Harris almost immediately "hog-tied" him from behind, and they struggled "for a minute or so." During the struggle, Wagner, who was extremely myopic, lost his glasses. Wagner then saw a figure, coming toward him rapidly, could not tell if the figure was armed, and held his knife-bearing arm out in self-defense.[1] Then Wagner's ankle gave, and he and Harris fell forward into Austin and continued to struggle. Wagner testified that he did not realize Austin had been stabbed in the scuffle and that he was "surprised" when later told of the stabbing.

Wagner also contended that he was insane at the time of the attack. He testified about his history of drug abuse before and during his incarceration in 1978, the climate of violence and racial hostility at Lompoc, his feelings of extreme anxiety and paranoia, and his hospitalization for psychiatric evaluation at a prison medical facility in Springfield, Missouri following the Sargis and Austin homicides.

However, Wagner presented no expert psychiatric testimony. His court-appointed psychiatrist had formed the opinion that Wagner had been sane at the time of the offense and was not called to testify. Shortly before trial, Wagner's counsel moved pursuant to Fed.R.Evid. 803(6) for a

---

1. Austin was 5′ 9″ tall and weighed 150 pounds. Wagner was taller, weighed at least 210 pounds, and was an avid exerciser. Wagner admitted that he had never seen Austin carry a weapon and saw no weapon on Austin's person on August 2. None of the correctional officers was permitted to carry a weapon. Wagner admitted that he refused to drop the knife because he wanted it in his possession so he could stick somebody if he had to.

ruling respecting the admissibility of two psychiatric reports that suggested Wagner may have suffered from a possible psychosis several months after Austin's murder. The reports had been prepared in late 1981 by Dr. Daniel V. Taub, a clinical psychologist, and Dr. Robert W. Collier, a psychiatrist, during Wagner's hospitalization at the Springfield medical facility. Wagner's counsel made no arrangements to have Dr. Taub or Dr. Collier testify at Wagner's trial. The district court ruled that the reports were inadmissible because Wagner had repeatedly refused to comply with the court's order pursuant to Fed.R.Crim.P. 12.2(c) that he submit to an examination by the government's psychiatrist.

Nonetheless, the jury ultimately learned of the contents of the two reports. Wagner agreed to testify after the court ruled that Wagner's counsel could use the reports in his cross-examination of the government's psychiatrist, who testified on the basis of his observation of Wagner during the trial.

The jury convicted Wagner of both first degree murder and conveying a weapon in a federal institution. The district court sentenced him to concurrent life and ten-year sentences, with both to be served consecutively to Wagner's sentence for bank robbery. When *Gouveia* was reversed by the Supreme Court, the government successfully appealed the district court's dismissal of the counts relating to the Sargis homicide, but ultimately dropped the charges in light of the sentence Wagner received for the Austin murder. In addition to bringing this direct appeal, Wagner has filed a petition to vacate sentence pursuant to 28 U.S.C. § 2255 (1982) alleging that he was deprived of his sixth amendment right to the effective assistance of counsel. The district court has stayed the section 2255 proceeding pending the outcome of this appeal.

## ANALYSIS

### 1. *Pre–Indictment Delay*

 Although Wagner's attack on Austin occurred on August 2, 1981, Wagner was not indicted until February 15, 1983, almost eighteen months later. Wagner contends that this preindictment delay hampered his defense preparation and thus denied him his fifth amendment right to due process of law. However, in order to block a prosecution because of preindictment delay, "the defendant must first show actual, nonspeculative prejudice resulting from the delay." *United States v. Rogers,* 722 F.2d 557, 561 (9th Cir.1983), *cert. denied,* 469 U.S. 835, 105 S.Ct. 129, 83 L.Ed. 2d 70 (1984). Upon a showing of prejudice, the court must consider the length of and reasons for the delay. *Id.* We review the district court's denial of a motion to dismiss for pre-indictment delay for an abuse of discretion. *Id.*

Wagner claims that the delay prevented him from collecting evidence of (1) other inmates' perceptions of him at the time of the killing (relevant to Wagner's sanity), (2) the racial tension within the prison at the time of the killing (relevant to Wagner's claim of paranoia), and (3) a prison regulation requiring guards to have prisoners stand away from grille doors when the doors are opened (relevant to Wagner's premeditation.) The record, however, contains no support for Wagner's assertion that he and his counsel were not later able to collect this evidence effectively. Wagner has not identified any witnesses or documents that were rendered unavailable because of the delay, and he has thus failed to demonstrate the threshold requirement of actual prejudice. It is therefore unnecessary for us to consider the length of and reasons for the pre-indictment delay.

### 2. *District Court's Denial of a Continuance*

The events preceding Wagner's request for a continuance on the day of trial require a lengthy explanation. On June 6, 1983, at the request of Wagner's counsel, the district court ordered that Wagner be examined by a court-appointed psychiatrist, Dr. Michael Coburn. On June 23, the district court ordered Wagner to submit to a Rule 12.2 examination by the government's psychiatrist, Dr. Saul Faerstein. However, on July 1, Wagner refused to talk to Dr.

Faerstein. The government's counsel immediately telephoned Wagner's counsel, who stated that he would speak to Wagner and advise him to cooperate in the examination. Wagner's counsel then spoke to Wagner over the telephone, but Wagner again refused to be examined.

At a hearing on July 13, the government renewed its motion for an examination order, and the district court ordered Wagner to submit to examination by no later than July 20. Both Wagner and his counsel indicated that Wagner intended to comply with the order. Wagner's counsel represented that Wagner had been advised that he might not be able to present his insanity defense unless he spoke with Dr. Faerstein, and that Wagner had refused to be examined on July 1 only because he had objected to the location and conditions of the examination. The district court and counsel then devoted considerable time to arrange for an examination at a location and under conditions satisfactory to Wagner. Nonetheless, on July 15, Wagner again refused to submit to Dr. Faerstein's examination.

On July 25, 1983, Wagner filed a *nunc pro tunc* motion to recall the court's June 23 examination order on the ground that the government had already had an opportunity to evaluate Wagner's mental condition while he was hospitalized at Springfield in 1981. The court denied the motion on August 1, 1983, the day before trial, because Wagner was examined at Springfield to determine his potential for future prison violence, not to determine his sanity at the time of the homicides.[2]

Based on Wagner's repeated refusal to submit to an examination by Dr. Faerstein, the government brought a motion pursuant to Fed.R.Crim.P. 12.2(d) to preclude Wagner from presenting expert testimony at trial. At the pre-trial conference on August 1, 1983, the district court granted the government's motion. At the same hearing, the court took up Wagner's motion pursuant to Fed.R.Evid. 803(6) for a pre-trial ruling respecting the admissibility of the Springfield psychiatric reports under the business record exception to the hearsay rule. Rather than addressing the hearsay issue, the court ruled that the reports were in any event inadmissible pursuant to Fed.R.Crim.P. 12.2(d) in light of Wagner's repeated refusal to comply with the court's examination order. Additionally, in ruling on Wagner's post-trial motion for a new trial, the district court concluded that the Springfield reports were in any event not admissible under Fed.R.Evid. 803(6) because they lacked sufficient clarity and trustworthiness to be put before the jury without the authors' live testimony and availability for cross examination.[3] Nei-

2. For the first time on appeal, Wagner contends that the district court erred in denying his *nunc pro tunc* motion because the government had failed to give proper notice of its application for the June 23 examination order. The record, however, reflects that Wagner was afforded ample opportunity to object to the government's examination request. Wagner consulted with his counsel before each of Dr. Faerstein's attempts to examine him, and Wagner's counsel repeatedly assured the government that Wagner would cooperate. On July 13, Wagner and his counsel both assured the district court that Wagner would comply with the order. Any technical failure by the government to give proper notice of its initial application did not affect Wagner's substantial rights. *See* Fed.R.Crim.P. 52(b).

Because Wagner was in fact afforded ample opportunity to consult with his counsel and to object to the government's proposed psychiatric examination, the sixth amendment concerns identified in *United States v. Garcia*, 739 F.2d 440, 442 (9th Cir.1984), are not implicated in this case.

3. Dr. Taub's conclusion that Wagner was "possibly psychotic" was based on a single admission interview with Wagner, and his half-page report did little to explain the basis of his diagnosis. Dr. Collier's reports respecting Wagner totalled at least five pages, were based on his observations of Wagner over a period of months, and listed multiple psychiatric diagnoses. One of the diagnoses was that Wagner suffered from "[p]ossible schizophrenia, based upon [his] past conduct history, [Dr. Taub's] psychology report, and [Wagner's] initial appearance." However, based on his own observations of Wagner, Dr. Collier also concluded that Wagner's possible schizophrenia had not overtly manifested itself at Springfield, that Wagner "was not a candidate for hospitalization," and that Wagner "present[ed] no active psychiatric problems." Dr. Collier recommended Wagner's "transfer to [a] regular prison institution."

Wagner was not examined at the Springfield medical facility to determine whether he was legally insane when he attacked Austin. Neither Dr. Taub nor Dr. Collier reached a definite

ther of the foregoing rulings has been challenged on appeal.

On August 2, 1983, the day trial was scheduled to commence and after the jury panel had been brought into the courtroom, Wagner's counsel moved for a continuance so that Wagner could be afforded another opportunity to submit to an examination by Dr. Faerstein. According to Wagner's counsel, he and Wagner had discussed Dr. Faerstein's potential bias against Wagner just before Dr. Faerstein's second attempt to examine Wagner on July 15. Counsel had advised Wagner that, if he refused to be examined by Dr. Faerstein, he would be precluded by Fed.R.Crim.P. 12.2(d) from calling any psychiatrists to testify at trial. However, counsel had interpreted Rule 12.-2(d) to exclude "only the oral statements made by witnesses in open court" and advised Wagner that "he could refuse to talk to Dr. Faerstein, and ... would still be able to admit [the Springfield reports] into evidence." In light of the district court's ruling that the reports were inadmissible pursuant to Rule 12.2(d), counsel felt that his advice had prejudiced Wagner's defense. Even if he now subpeonaed Dr. Collier[4] or Dr. Coburn, explained counsel, it was his understanding that the district court's order precluded the doctors from testifying on Wagner's behalf. After listening to counsel's explanation, the district court stated that Wagner had been given sufficient time to comply with the court's examination order and denied the motion for a continuance.

"The denial of a motion for a continuance will not be reversed absent a clear abuse of discretion." *United States v. Gonzalez,* 800 F.2d 895, 898 (9th Cir.1986). Additionally, to demonstrate reversible error, "the defendant must show that the denial resulted in actual prejudice to his defense." *Id.*

■ There were substantial reasons for the district court to deny Wagner's motion for a continuance. The court had already granted Wagner a continuance from June 21 to August 2, 1983 so that Wagner could be examined. Prior to August 2, Wagner and his counsel had represented to both the government and the court that Wagner would submit to Dr. Faerstein's examination. Wagner refused to be examined after the district court had devoted substantial time and effort to ensure that Wagner was comfortable with the location and conditions of the examination. Moreover, the request for a continuance came on the day of trial when the jury panel was in the courtroom and the government had already assembled several out-of-town witnesses at the courthouse. The government's psychiatrist, Dr. Faerstein, had arranged his calendar to be present at trial. Additionally, Wagner's counsel had yet to make any arrangements for expert witnesses to appear at trial, and did not inform the court how their testimony would assist Wagner or when they would be available to appear at trial. *See United States v. Domina,* 784 F.2d 1361, 1373 (9th Cir.1986) ("When the accused requests a continuance to obtain witnesses, he must show, *inter alia,* what their testimony will be, the relevance of that testimony, and that he can probably obtain the witness if the continuance is granted."); *cert. denied,* — U.S. —, 107 S.Ct. 893, 93 L.Ed.2d 845 (1987). Given these circumstances, the district court's refusal to grant a continuance would generally not constitute an abuse of discretion.

We are of course concerned by counsel's claim that Wagner refused to comply with the court's examination order because he relied on erroneous legal advice offered by his counsel. However, counsel's remarks on August 2 were contrary to counsel's earlier assurances to the court (and in

---

diagnosis of Wagner's condition, and Dr. Collier's report offered multiple diagnoses. Given the foregoing circumstances, as well as the fact that Dr. Collier had been subsequently terminated from Springfield, the district court concluded that the Springfield reports were not admissible absent live testimony by their authors.

**4.** Wagner's counsel did not indicate that he wished to subpeona Dr. Taub. The record re-

flects that the government contacted both Dr. Taub and Dr. Collier, informed Wagner's counsel that both doctors were available to testify, and provided Wagner's counsel with their addresses and phone numbers. The record does not reflect whether Wagner's counsel actually contacted either Dr. Taub or Dr. Collier.

Wagner's presence) that Wagner had been advised he might lose his insanity defense unless he complied with the examination order. Moreover, when the court inquired into the matter on August 2, Wagner's counsel stated that he had "suggested [to Wagner] that the *possibility* existed for introducing those records without the necessity of calling any experts." (Emphasis added.) On this record, it is unclear just what advice counsel gave Wagner and to what extent Wagner relied on that advice in again refusing to be examined by Dr. Faerstein.

■ In any event, there is no evidence before us that Wagner's insanity defense was prejudiced by the court's denial of the motion for a continuance. If, as Wagner's counsel intimated, he wanted to call Dr. Collier or Dr. Coburn to testify on Wagner's behalf, nothing in the record suggests that they could have helped Wagner. Prior to the trial, both Wagner's counsel and the government had informed the court that Dr. Coburn had found Wagner to be sane at the time of the Austin killing.[5] Wagner's counsel offered the court no explanation of what Dr. Collier's testimony would be or how it might help Wagner. On the other hand, the government's counsel had submitted a declaration to the court respecting her own conversation with Dr. Collier. According to the declaration, Dr. Collier had stated that he did not examine Wagner to determine his sanity at the time of the offense and would not necessarily conclude from his report that Wagner was insane when he killed Austin. Additionally, counsel's declaration stated that Dr. Collier had recently been fired from his position at the Springfield medical facility and that his opinions appeared to be in some disrepute.

Wagner's real problem was not that the district court denied him a continuance, but rather that no medical expert had ever found him to be insane at the time of the Austin homicide. Wagner could not have introduced the Springfield reports into evidence without calling the authors to testify. Nonetheless, despite the government's

strenuous objection, the district court ultimately allowed Wagner's counsel to put the contents of the unauthenticated Springfield reports before the jury during his cross-examination of Dr. Faerstein. And in his closing argument, Wagner's counsel not only used the reports in an effort to impeach Dr. Faerstein's testimony, but the government raised no objection when Wagner's counsel strenuously argued that the reports reflected Wagner's true mental condition at the time of the offense.

Given that the record provides no indication that Dr. Coburn, Dr. Collier, or any other expert would have testified favorably for Wagner, and given that the contents of the Springfield psychiatric reports were ultimately put before the jury, the record before us offers no evidence that Wagner was prejudiced by the district court's denial of his motion for a continuance. If Wagner's counsel failed to call expert witnesses who would have testified that Wagner was insane at the time of the Austin homicide, Wagner can make a record of that fact in his section 2255 proceeding in which he claims ineffective assistance of counsel.

### 3. *District Court's Failure to Inquire into Adequacy of Wagner's Counsel*

Prior to trial, Wagner moved the district court to dismiss his court-appointed counsel and to appoint new counsel. Wagner now contends that the district court committed reversible error by denying his motion and by failing to inquire sufficiently into his complaints about the adequacy of his representation. We disagree.

■ The district court's denial of a motion to substitute counsel is reviewed for an abuse of discretion. *Gonzalez*, 800 F.2d at 898. However, a refusal to allow a substitution of attorneys may deprive a defendant of his sixth amendment right to the effective assistance of counsel "if the defendant and his attorney are embroiled in an 'irreconcilable conflict.'" *United States v. McClendon*, 782 F.2d 785, 789 (9th Cir.1986) (quoting *Brown v. Craven*, 424 F.2d 1166, 1170 (9th Cir.1970)).

**5.** Dr. Coburn refused to testify for the government.

At the hearing on July 13, 1983, the district court took up Wagner's handwritten motion to dismiss his counsel. However, when the court attempted to inquire into the matter, Wagner immediately withdrew his motion and told the court that the matter "has been resolved" and that he was "satisfied."

On August 1, 1983, at a hearing the day before trial, the district court took up Wagner's second handwritten motion to dismiss his counsel. In the motion itself, Wagner expressed dissatisfaction with his counsel. At the hearing, however, Wagner told the court that his lawyer was "a fine gentleman ... [and] a fine attorney," but that a conflict had arisen between them because "the inadequate investigative procedures" of one Mr. La Palme, a court-appointed investigator, had prejudiced Wagner's defense. Several of Wagner's specific complaints about La Palme's investigation involved the Sargis homicide, and the charges against Wagner for that killing were subsequently dismissed. However, Wagner also complained that La Palme had failed to interview any witnesses to the Austin homicide. In La Palme's defense, Wagner's counsel responded that no inmates were believed to have witnessed the Austin homicide, but that he had just been informed of a potential inmate witness who had not been interviewed. Counsel also explained that Wagner had informed La Palme by letter that Wagner would not talk to him in the future.[6] After listening to Wagner's complaints and counsel's explanation, the district court denied the motion and instructed Wagner's counsel to contact La Palme.

■ "It is within the trial judge's discretion to deny a motion to substitute made ... on the eve of trial if the substitution would require a continuance." *McClendon*, 782 F.2d at 789. Wagner's dissatisfaction was with his court-appointed investigator, not his court-appointed counsel, and the court instructed counsel to contact the investigator about Wagner's concerns. Nothing in the record suggests that the

alleged conflict resulted in a breakdown of communication or prevented counsel from adequately presenting Wagner's defense at the subsequent trial. And by refusing to cooperate with La Palme, Wagner himself was at least partially responsible for the alleged inadequacies in the investigation of his case. Given these factors, the district court did not abuse its discretion in denying Wagner's motion for new counsel.

■ While Wagner does not argue on this direct appeal that his counsel's ineffectiveness violated his sixth amendment rights, he does contend that the district court violated his sixth amendment rights by failing to inquire further into the ineffectiveness of his counsel. "[T]he customary procedure in this Circuit for challenging the effectiveness of defense counsel in a federal criminal trial is by collateral attack on the conviction under 28 U.S.C. § 2255, and this Court has been chary of analyzing insufficiency of counsel claims on direct appeal." *United States v. Schaflander*, 743 F.2d 714, 717 (9th Cir.1984) (per curiam) (citations omitted), *cert. denied*, 470 U.S. 1058, 105 S.Ct. 1772, 84 L.Ed.2d 832 (1985). "This is so because usually such a claim cannot be advanced without the development of facts outside the original record." *United States v. Birges*, 723 F.2d 666, 670 (9th Cir.), *cert. denied*, 466 U.S. 943, 104 S.Ct. 1926, 83 L.Ed.2d 131 (1984). We have, however, recognized that if the defendant's legal representation was so inadequate as obviously to deny him his sixth amendment right to counsel, the trial court's failure to take notice sua sponte of the problem " 'might constitute plain error which may be considered on direct appeal.' " *United States v. Kazni*, 576 F.2d 238, 242 (9th Cir.1978) (quoting *United States v. Porter*, 431 F.2d 7, 11 (9th Cir.), *cert. denied*, 400 U.S. 960, 91 S.Ct. 360, 27 L.Ed.2d 269 (1970)).

Wagner claims that his counsel's ineffectiveness should have been apparent to the court because counsel failed to subpeona any medical doctors and failed to subpeona the inmate who Wagner claims may have

---

**6.** On July 4, 1983, Wagner wrote to La Palme that there was no need for him to visit Wagner

anymore because Wagner would never discuss any aspect of his case with La Palme again.

witnessed the attack. However, counsel's failure to call the witnesses is not necessarily indicative of ineffectiveness, for nothing in the record establishes that any of these witnesses would have advanced Wagner's defense.[7] The record before us illustrates precisely why ineffective assistance claims cannot generally be evaluated on direct appeal. The district court was certainly not required by this record to question counsel's trial strategy, and it was not plain error for the court to fail to raise sua sponte the inadequacy of Wagner's representation.

We of course express no opinion on the merits of Wagner's claim of ineffective assistance. Wagner's section 2255 proceeding will provide him with an opportunity to develop a record demonstrating how the evidence his counsel allegedly failed to adduce at trial would have advanced his defense. *See United States v. Rachels*, 820 F.2d 325, 328 (9th Cir.1987) (observing that the proper avenue for defendant to raise an ineffective assistance claim "would appear to be a collateral attack of his sentence which would then provide some record upon which this Court could base its review").

### 4. *Self-Incrimination*

■ Wagner claims that, because his counsel called no lay witnesses and presented no expert testimony, he was left with no choice but to take the stand in order to present a believable case to the jury. Thus, contends Wagner, the district court's failure to inquire into the adequacy of his representation effectively forced Wagner to waive his fifth amendment right not to testify.

Wagner's fifth amendment argument is merely an attempt to recast the sixth amendment claim that we have just rejected. His decision to testify was not compelled by circumstance, but was rather a strategic choice to maximize his chances of success at trial. "That the defendant faces

such a dilemma demanding a choice between complete silence and presenting a defense has never been thought an invasion of the privilege against compelled self-incrimination." *Williams v. Florida*, 399 U.S. 78, 84, 90 S.Ct. 1893, 1897, 26 L.Ed.2d 446 (1970); *see also United States v. Burreson*, 643 F.2d 1344, 1350 (9th Cir.) ("[Defendants'] testimony, even if partly motivated by a desire to respond to evidence admitted against them, was not 'compelled' testimony."), *cert. denied*, 454 U.S. 847, 102 S.Ct. 165, 70 L.Ed.2d 135 (1981).

■ We also find no merit in Wagner's contention that the district court failed to inquire into whether Wagner knowingly and intelligently waived his right not to testify. Wagner cites no case law to support his contention that the trial court must inquire into a defendant's decision to testify, and we see no reason to impose such a rule. As observed by the Seventh Circuit in *United States v. Goodwin*, 770 F.2d 631, 637 (7th Cir.1985), *cert. denied*, 474 U.S. 1084, 106 S.Ct. 858, 88 L.Ed.2d 897 (1986):

> It is primarily the responsibility of the defendant's counsel, not the trial judge, to advise the defendant on whether or not to testify and to explain the tactical advantages and disadvantages of doing so. If a judge deems it necessary to comment on what he or she views as an inadvisable decision in this critical area, then the court should discuss the matter with the defendant's counsel. Discussing the issue directly with the defendant may inappropriately involve the judge in the unique attorney-client relationship, raising possible Sixth Amendment concerns as well as ... Fifth Amendment problems.

### 5. *The "Consciousness of Guilt" Instruction*

During his testimony on behalf of the government, Dr. Faerstein testified that he had attempted to examine Wagner, but

---

7. The government had submitted a declaration to the district court stating that, according to its investigation, no inmates had witnessed Wagner's attack on Austin. And, as we have already noted, the record is devoid of any evidence that any medical expert had ever found Wagner legally insane at the time of the killing.

**1484**

Wagner had refused to be examined. The district court instructed the jury as follows:

There is evidence that the defendant, after his arrest, refused to obey an order of this Court to speak to a government psychiatrist.

The Court's order was a lawful order. It does not violate the defendant's privilege against self-incrimination, since it did not require the defendant to give testimony. The refusal to obey the order is not sufficient to show guilt of the offense charged. An innocent person held on such charges may adopt various stratagems and refuse to submit to a psychiatric examination. You may consider the defendant's refusal, however, and may give it such weight as you think it is entitled to as tending to prove consciousness of guilt.

■ Because Wagner's trial counsel failed to raise any objection to the foregoing instruction, we review for plain error. *See* Fed.R.Crim.P. 30, 52(b). Without citing any authority, the government maintains that this court has to date affirmed the use of such instructions. Wagner simply argues that it is the better practice to omit instructions of this type and to leave it to counsel to argue what inferences should be drawn from the evidence. We, however, find that the instruction was inappropriate for a more fundamental reason.

The "consciousness of guilt" instruction at issue was derived from E. Devitt & C. Blackmar, 1 *Federal Jury Practice & Procedure* § 15.15 (3d ed. 1977), which is based on cases providing that the jury may infer the defendant's guilt from his failure to comply with a court order to furnish a handwriting specimen, to speak certain words or to wear a wig and sunglasses during a lineup, or to try on an article of clothing found at the crime scene.[8] Along

the same lines, this court has held that "[a]n attempt by a criminal defendant to suppress evidence is probative of consciousness of guilt and admissible on that basis." *United States v. Castillo,* 615 F.2d 878, 885 (9th Cir.1980).

In *Karstetter v. Cardwell,* 526 F.2d 1144, 1145 (9th Cir.1975), this court observed that "once the defendant indicates his intention to present expert testimony on the insanity issue, the privilege against self-incrimination does not thereafter protect him from being compelled to talk to the State's expert witnesses." And we held that the trial court did not err in permitting the government's psychiatric expert to testify that the defendant had refused to submit to a mental examination. *Id.* However, *Karstetter* did not discuss the relevance of such testimony or the purposes for which the jury may consider the defendant's refusal to be examined.

A defendant's refusal to provide fingerprints or a voice exemplar deprives the government of evidence that is directly related to the defendant's guilt or innocence of the underlying crime. However, a defendant's refusal to submit to a mental examination does not suppress evidence directly implicating the defendant in the underlying crime. The purpose of a Rule 12.2 mental examination is to assess the defendant's contention that he lacked the capacity to form the requisite criminal intent to commit the crime. The examination is unrelated to the issue of whether, if competent, the defendant actually formed the requisite criminal intent. Since none of Wagner's statements during the examination could have been used to establish his guilt at trial, *see* Fed.R.Crim.P. 12.2(c), it is illogical to assume that Wagner refused to be examined in an attempt to suppress

8. *See, e.g., United States v. Terry,* 702 F.2d 299, 314 (2d Cir.) (holding that defendants' refusal to provide palm prints "was admissible as evidence of consciousness of guilt"), *cert. denied,* 461 U.S. 931, 103 S.Ct. 2095, 77 L.Ed.2d 304 (1983); *United States v. Franks,* 511 F.2d 25, 35–36 (6th Cir.) (upholding instruction that jury could infer defendant's consciousness of guilt from his refusal to provide court-ordered voice exemplar), *cert. denied,* 422 U.S. 1042, 95 S.Ct. 2656, 45 L.Ed.2d

693 (1975); *United States v. McKinley,* 485 F.2d 1059, 1060–61 (D.C.Cir.1973) (upholding admission of evidence that defendants violated court order not to shave prior to appearing in a lineup); *Owens v. Wolff,* 532 F.Supp. 397, 399 (D.Nev.1981) (approving instruction that evidence of defendant's failure to submit court-ordered handwriting exemplars is probative of consciousness of guilt).

evidence of his guilt. The chain of inferences between a defendant's refusal to be examined and his guilt of the underlying crime is, at best, much too attenuated and speculative to support a "consciousness of guilt" instruction.[9]

While the district court's instruction was improper, this circuit has previously held that an inappropriate "consciousness of guilt" instruction may amount to harmless error. In *United States v. Feldman*, 788 F.2d 544 (9th Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 955, 93 L.Ed.2d 1003 (1987), the bank robbery at issue had been committed by a bearded man. A teller identified the defendant from a bearded photograph, and the defendant had a beard when he was arrested. The district court instructed the jury that the fact defendant had shaved off his beard shortly before trial " 'may be considered . . . in light of all other evidence in the case in determining guilt or innocence.' " *Id.* 107 S.Ct. at 555. Although the instruction was improper because "[t]he chain of [in]ferences . . . was pitifully weak," the panel concluded that the error was harmless in light of the "highly probative search and identification evidence against [the defendant]." *Id.*

■ Wagner has been convicted of first degree murder, not bank robbery, and we should not lightly affirm a conviction that has resulted in a life sentence when the jury has been instructed that it may draw an impermissible inference of guilt. However, "the plain-error exception to the contemporaneous-objection rule is to be 'used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.' " *United States v. Young*, 470 U.S. 1, 15, 105 S.Ct. 1038, 1047, 84 L.Ed.2d 1 (1985) (quoting *United States v. Frady*, 456 U.S. 152, 163 n. 14, 102 S.Ct. 1584, 1592 n. 14, 71 L.Ed.2d 816 (1982)). The rule balances "our need to encourage all trial participants to seek a fair and

accurate trial the first time around against our insistence that obvious injustice be promptly redressed." *Frady*, 456 U.S. at 163, 102 S.Ct. at 1592. Application of the plain error standard "necessarily requires consideration of all circumstances at trial including the strength of the evidence against [the] defendant[ ]." *United States v. Stout*, 667 F.2d 1347, 1354 (11th Cir. 1982). This court has also observed that " '[a]n improper instruction rarely justifies a finding of plain error.' " *United States v. Bustillo*, 789 F.2d 1364, 1367–68 (9th Cir.1986) (quoting *United States v. Glickman*, 604 F.2d 625, 632 (9th Cir.1979), *cert. denied*, 444 U.S. 1080, 100 S.Ct. 1032, 62 L.Ed.2d 764 (1980)).

We do not believe that an "obvious injustice" has been perpetrated in this case. The government presented eye witnesses who testified that Wagner pulled a knife, chased, and stabbed an unarmed man in the heart. There was also convincing evidence of Wagner's premeditation and motive. Given the facts of this case, we are convinced beyond a reasonable doubt that the erroneous instruction did not affect the outcome of the jury's deliberations, and we decline to reverse for plain error.[10]

### 6. *Failure to Give a Self-Defense Instruction*

■ Wagner contends that the district court erred in refusing to give a jury instruction on self-defense. Wagner claims that he feared Austin was going to throw the hot water at him and that he grabbed the pitcher and emptied its contents in Austin's face as a "preemptive strike." According to Wagner, a jury might have found his subsequent act of stabbing Austin was justified in light of Austin's conduct and Wagner's struggle with officer Harris.

---

**9.** Given our conclusion, we need not consider whether the court's instruction was improper under Fed.R.Crim.P. 12.2(c) or the fifth amendment.

**10.** Even if Wagner's counsel had made a timely objection at trial, we could not ignore "the duty of a reviewing court to consider the trial record

as a whole and to ignore errors that are harmless, including most constitutional violations." *United States v. Hasting*, 461 U.S. 499, 509, 103 S.Ct. 1974, 1980, 76 L.Ed.2d 96 (1983). Our conclusion would be the same under the "harmless error" standard.

We review de novo the district court's refusal to give a jury instruction on the defendant's theory of the case. *United States v. Doubleday,* 804 F.2d 1091, 1093 (9th Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 1628, 95 L.Ed.2d 201 (1987). While "the merest scintilla of evidence" will not suffice, a self-defense instruction "must be given if there is evidence upon which the jury could rationally sustain the defense." *United States v. Jackson,* 726 F.2d 1466, 1468 (9th Cir.1984). "This standard protects the right of the defendant to have the jury weigh the evidence and the credibility of the witnesses when the evidence raises a factual dispute and, at the same time, protects against improper verdicts." *Id.*

■■■ Wagner was not entitled to an instruction on self-defense. Perhaps he would have been entitled to such an instruction had he been tried for assaulting Wagner with hot water. Wagner, however, was tried for murder. "[O]ne who is the aggressor in a conflict culminating in death cannot invoke the necessities of self-preservation." *United States v. Peterson,* 483 F.2d 1222, 1231 (D.C.Cir.), *cert. denied,* 414 U.S. 1007, 94 S.Ct. 367, 38 L.Ed.2d 244 (1973); *see also* 2 E. Devitt & C. Blackmar, *Federal Jury Practice & Procedure* § 41.19 (3d ed. 1977). Austin's alleged attempt to grab the hot water pitcher did not justify Wagner's pulling a knife after all danger had passed. In *United States v. Garcia,* 625 F.2d 162 (7th Cir.), *cert. denied,* 449 U.S. 923, 101 S.Ct. 325, 66 L.Ed. 2d 152 (1980), the defendants had stabbed another prison inmate to death in a fight.

In affirming the defendants' conviction for second degree murder, the Seventh Circuit observed that, although the origins of the fight were uncertain, it was clear that when the defendants chased their victim down a hall and stabbed him to death, "they were no longer acting in self-defense." *Id.* at 170. "That justification for their conduct ceased when they became the aggressors." *Id.; see also Gurrieri v. Gunn,* 404 F.Supp. 21, 25 (C.D.Cal.1975) (when defendant and victim initially engaged in a fist fight, defendant's subsequent pulling of a knife was unreasonable, excessive, and invalidated claim of self-defense under California law).

When Wagner pulled the knife and pursued Austin, there is no dispute that Austin —a much smaller man, unarmed, and severely burned—was in retreat and fleeing for his life. The only evidence of self-defense was Wagner's self-serving, affirmative response to one of his counsel's leading questions. Counsel asked Wagner if he tried to hold his arm out in self-defense when he saw a figure advancing toward him,[11] and Wagner replied "Yes, I did." Wagner's role as the aggressor, however, deprives him of the right to assert that defense. Moreover, the remainder of Wagner's testimony was inconsistent with self-defense. According to Wagner, the stabbing was an accident and occurred when Harris "was throwing [him] around." Wagner claimed that he never intended to stab Austin, was unaware that the stabbing occurred, and was "surprised" when later told of the stabbing.[12] And Wagner's unexplained suggestion that his struggle

---

**11.** Wagner's testimony about Austin's movements was extremely confusing. Wagner testified that he perceived a figure advancing toward him, but when asked to explain further, Wagner said the figure "was moving sort of to the side ... between me and Harris ... and the wall." It is thus unclear whether Wagner actually perceived the figure moving toward him. It is also unclear from Wagner's testimony exactly when he realized that the figure was Austin.

**12.** A defendant may assert defenses that are inconsistent with his own testimony. *See United States v. Demma,* 523 F.2d 981, 985 (9th Cir.1975) (en banc). However, for a defendant to be entitled to an instruction, there must still be enough evidence in the record so that a

rational jury could conclude that the defense has been established. On the record before us, the evidence is simply insufficient to support a rational finding that Wagner acted in self-defense. *Cf. United States v. Crowder,* 543 F.2d 312, 318 (D.C.Cir.1976), *cert. denied,* 429 U.S. 1062, 97 S.Ct. 788, 50 L.Ed.2d 779 (1977) (observing that "the items of proof in a criminal case may resemble the pieces of a jigsaw puzzle," but holding that defendant was not entitled to a self-defense instruction because his theory "fragments the testimony in a 'selective process ... so attenuated as to strain credulity to the breaking point'") (quoting *Brooke v. United States,* 385 F.2d 279, 283 (D.C.Cir.1967)).

with officer Harris somehow justified the stabbing is unavailing, for Wagner had no right to resist Harris' lawful attempts to restrain and disarm him. The district court did not err in refusing to instruct the jury on self-defense.

### 7. *Failure to Give a Manslaughter Instruction*

The court instructed the jury on the elements of first and second degree murder, but did not instruct the jury respecting the lesser-included offense of manslaughter. Wagner argues that the court erred in refusing his manslaughter instruction because the jury was thereby precluded from convicting him of manslaughter if it failed to reach unanimity on the murder charges.

To be entitled to an instruction on a lesser-included offense, the defendant must demonstrate that (1) the lesser offense is within the offense charged, and (2) based on the evidence presented at trial, " 'a rational jury could find the defendant guilty of the lesser offense but not the greater.' " *United States v. Brown*, 761 F.2d 1272, 1277 (9th Cir.1985) (quoting *United States v. Harvey*, 701 F.2d 800, 807 (9th Cir.1983)). "The trial court is in a better position to determine whether there is sufficient evidence to give a lesser included offense instruction," and its determination "will not be disturbed on appeal without an abuse of discretion." *United States v. Steel*, 759 F.2d 706, 711 (9th Cir.1985); *accord, United States v. Chapman*, 615 F.2d 1294, 1298 (10th Cir.), *cert. denied*, 446 U.S. 967, 100 S.Ct. 2947, 64 L.Ed.2d 827 (1980); *United States v. Busic*, 592 F.2d 13, 25 (2d Cir. 1978).

 Other than making a conclusory assertion that he was entitled to a manslaughter instruction, Wagner has made absolutely no effort in his briefs to demonstrate how, on this record, a rational jury might have convicted him of manslaughter but not murder. The transcript below reflects that Wagner's counsel advanced a voluntary manslaughter theory in support of the instruction.[13] He argued that Wag-

ner was "in a quarrel situation with [officer] Harris" and that Wagner stabbed Austin in a "heat of passion" when Austin suddenly appeared on the scene.

"Voluntary manslaughter is a lesser included offense of murder." *United States v. Scafe*, 822 F.2d 928, 932 (10th Cir.1987); *see also United States v. Celestine*, 510 F.2d 457, 460 (9th Cir.1975). The absence of malice distinguishes manslaughter from murder, *see* 18 U.S.C. §§ 1111(a), 1112(a), and the defendant's showing of a "heat of passion" is said to negate the presence of malice. *Scafe*, 822 F.2d at 932; *United States v. Collins*, 690 F.2d 431, 437 (5th Cir.1982), *cert. denied*, 460 U.S. 1046, 103 S.Ct. 1447, 75 L.Ed.2d 801 (1983). The standard, however, is not a subjective one. "While the crime of manslaughter is in some sense 'irrational' by definition, in that it arises out of a person's passions, the provocation must be such as would arouse a reasonable and ordinary person to kill someone." *Collins*, 690 F.2d at 437; *see also United States v. Eagle Elk*, 658 F.2d 644, 649 (8th Cir.1981); 2 E. Devitt & C. Blackmar, *Federal Jury Practice and Instructions* § 41.14 (1977).

The evidence in this case does not establish circumstances that would incite an ordinary, reasonable person to kill. Wagner pulled a knife and chased an unarmed, seriously burned inmate who posed no threat to him at the time. Wagner's suggestion that his "sudden quarrel" with officer Harris mitigates his culpability is absurd, for no reasonable person would be driven to kill by an officer's lawful efforts to stop a fight. Officer Harris was unarmed and, at great danger to himself, was attempting to restrain Wagner from continuing his attack. Moreover, there was no evidence that Wagner stabbed Austin in a "heat of passion." Wagner steadfastly claimed the stabbing was an accident and occurred when Harris "was throwing [him] around." The district court did not abuse its discretion in refusing to instruct the jury on voluntary manslaughter.

---

**13.** Voluntary manslaughter is the unlawful killing of a human being without malice "[u]pon a

sudden quarrel or heat of passion." 18 U.S.C. 1112(a) (1982).

Although Wagner testified that the stabbing was an accident, Wagner's trial counsel only objected to the court's failure to instruct on voluntary manslaughter. He made no attempt to demonstrate how the evidence supported an instruction on involuntary manslaughter and thus did not preserve an objection to the district court's failure to instruct on that offense. *See* Fed.R.Crim.P. 30. In any event, it is certainly not obvious on this record that, at the time of the killing, Wagner was engaged in a lawful act or in the commission of an unlawful act not amounting to a felony. *See* 18 U.S.C. § 1112(a) (1982). The district court did not commit plain error by failing to instruct on the offense.[14]

## CONCLUSION

For the reasons given above, the judgment of the district court is affirmed.

AFFIRMED.

---

14. Even if a defendant is entitled to an involuntary manslaughter instruction, there are strategic reasons why the defendant might not want the instruction. When the government does not seek a manslaughter instruction and goes forward with a prosecution only on a murder theory, it leaves itself open to the possibility that the jury will acquit the defendant on a finding that the defendant killed without malice (*i.e.,* by accident.) Thus, unless a defendant clearly and explicitly objects to the trial court's failure to instruct on involuntary manslaughter in a murder prosecution such as this, we would be extremely reluctant to find that the trial court committed plain error in failing to so instruct the jury.