FILED

**NOT FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

JAN 21 2020

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 17-50432 |
| Plaintiff-Appellee, | D.C. No. 3:15-cr-03175-JM-1 |
| v. | |
| DAVID ENRIQUE MEZA, | MEMORANDUM[*] |
| Defendant-Appellant. | |

Appeal from the United States District Court
for the Southern District of California
Jeffrey T. Miller, District Judge, Presiding

Argued and Submitted December 9, 2019
Pasadena, California

Before: N.R. SMITH and WATFORD, Circuit Judges, and KORMAN,[**] District Judge.

David Meza appeals his convictions for: (1) foreign domestic violence

resulting in death under 18 U.S.C. § 2261(a)(1), and (2) conspiracy to obstruct

justice under 18 U.S.C. § 1512(c)(2), (k). Specifically, Meza argues that: (1) he

---

[*] This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.

[**] The Honorable Edward R. Korman, United States District Judge for the Eastern District of New York, sitting by designation.

was not given adequate *Miranda* warnings, (2) he did not knowingly and intelligently waive his *Miranda* rights, (3) the district court abused its discretion in denying his request for a "heat of passion" defense instruction, and (4) the indictment for the obstruction offense failed to properly allege the mens rea element of conspiracy to obstruct justice. We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

1.     The adequacy of a *Miranda* warning is reviewed de novo. *See United States v. Loucious*, 847 F.3d 1146, 1148–49 (9th Cir. 2017). "The Supreme Court has not required a 'precise formulation of the warnings given' to a suspect and has stressed that a 'talismanic incantation' is not necessary to satisfy *Miranda*'s 'strictures.'" *Id.* at 1149 (quoting *California v. Prysock*, 453 U.S. 355, 359 (1981) (per curiam)). "[T]he inquiry is simply whether the warnings reasonably convey to a suspect his rights." *Id.* (quoting *Duckworth v. Eagan*, 492 U.S. 195, 203 (1989)). In this case, despite the detective's prefatory statements and his casual manner of delivering the *Miranda* advisal, the *Miranda* advisal provided to Meza was constitutionally sufficient, because it "reasonably convey[ed]" to Meza his rights. *Id.*

2.     Whether a defendant knowingly and intelligently waives his *Miranda* rights is a question of fact we review for clear error. *See United States v. Price*, 921 F.3d

777, 791 (9th Cir. 2019). Furthermore, in determining whether a *Miranda* waiver is knowing and intelligent, we consider the totality of the circumstances, including:

> (i) the defendant's mental capacity; (ii) whether the defendant signed a written waiver; (iii) whether the defendant was advised in his native tongue or had a translator; (iv) whether the defendant appeared to understand his rights; (v) whether the defendant's rights were individually and repeatedly explained to him; and (vi) whether the defendant had prior experience with the criminal justice system.

*Id.* at 792 (quoting *United States v. Crews*, 502 F.3d 1130, 1140 (9th Cir. 2007)). In this case, while Meza did not sign a written waiver, there is no question as to Meza's mental capacity, there was no language barrier, Meza appeared to understand his rights, Meza's rights were individually explained to him, and Meza had prior experience with the criminal justice system. For these reasons, the district court's determination that Meza knowingly and intelligently waived his Miranda rights was not clearly erroneous.

3. "Where the parties dispute whether the evidence supports a proposed instruction, we review a district court's rejection of the instruction for an abuse of discretion." *United States v. Bello–Bahena*, 411 F.3d 1083, 1089 (9th Cir. 2005). Though the evidentiary standard is not high in this context, *see id.* at 1091, "there still must be some evidence demonstrating the elements of the defense before an instruction must be given," *United States v. Spentz*, 653 F.3d 815, 818 (9th Cir.

3

2011). Because there is no evidence in the record showing "provocation . . . such as would arouse a reasonable and ordinary person to kill someone" that would support a "heat of passion" instruction, *United States v. Roston*, 986 F.2d 1287, 1291 (9th Cir. 1993) (quoting *United States v. Wagner*, 834 F.2d 1474, 1487 (9th Cir. 1987)), the district court did not abuse its discretion in denying Meza's proposed instruction.

4.     Meza's argument that Count II of the indictment should have been dismissed (because it did not expressly state that the subsequent proceeding must *actually be foreseen*) is squarely foreclosed by *Marinello v. United States*, 138 S. Ct. 1101 (2018). In that case, the Supreme Court stated that the government must only show "that the proceeding was pending at the time the defendant engaged in the obstructive conduct or, at the least, was then reasonably foreseeable by the defendant." *Id.* at 1110. Because this is precisely what the superceding indictment alleged, Meza's argument fails.

**AFFIRMED.**

FILED

JAN 21 2020

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

*United States v. David Enrique Meza*, **Case No. 17-50432**

KORMAN, District Judge, concurring:

I concur in full in the memorandum affirming the judgment of conviction. Nevertheless, because of the extent to which the defendant presses his argument over the prefatory statements and casual manner in which the *Miranda* warnings were given, I write briefly to explain why any defect was harmless. The Supreme Court has held that "[w]hen reviewing the erroneous admission of an involuntary confession, the appellate court, as it does with the admission of other forms of improperly admitted evidence, simply reviews the remainder of the evidence against the defendant to determine whether the admission of the confession was harmless beyond a reasonable doubt." *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991).

The uncontroverted evidence, independent of the post-arrest statement, is as follows. In 2013, Jake Clyde Merendino, whom the defendant was found guilty of murdering, was a wealthy man in his fifties living in Houston, Texas. That summer, he took a vacation to San Diego, where he responded to an online ad posted by David Enrique Meza, a 24-year-old male prostitute. Meza came to Merendino's hotel room and stayed for an hour; a few days later, the two met again for dinner. After the vacation, Merendino paid for Meza to visit him in Houston, where they spent a weekend together. Merendino visited Meza once more that summer in San Diego,

1

where he bought Meza a car, paid for him to enroll in college courses, and began sending him regular wire payments.

While his relationship with Merendino developed, Meza was also dating a 19-year-old woman named Taylor Langston. The pair got engaged in September 2013. Throughout the following year, Merendino visited Meza in San Diego several times, bought him another car and a motorcycle, and added him to his bank account. In December, Merendino wrote out a will leaving "everything" to Meza. Soon after, Merendino bought a condo in Rosarito, Mexico, just across the border from San Diego, and listed Meza as the beneficiary of the condo in case of his death. Meza meanwhile told Langston and his family that the reason for his absences and the source of his income was a man named "George," for whom Meza claimed to be working as a personal assistant. In October 2014, Langston became pregnant. As the due date approached, Meza began telling people that "George" was sick and insinuated that he did not have long to live. He and Langston made plans about what they would do "when we get George's car."

In late April 2015, Merendino left Texas to move with Meza into the condo in Rosarito. On May 1, after signing the closing documents together, Meza and Merendino checked in to a nearby hotel, as the condo was undergoing renovations. They spent the evening together until about 10:20 p.m., when Meza rode his motorcycle back to his apartment in San Diego. At approximately 12:30 a.m., Meza

2

rode back to Mexico and stopped on the side of the road a few miles from the hotel. At about 2:00 a.m., Meza called Merendino and asked him to come meet him because his motorcycle had stalled. Merendino left the hotel in his car and did not return. That morning, Mexican police found Merendino's body. Merendino had been stabbed 24 times, including two large slash wounds to the neck. His body had then been dragged and thrown into a nearby ravine. GPS data puts Meza at the scene of the crime when it occurred and video surveillance showed that he changed his clothes before crossing back over the border to the United States at about 4:00 a.m.

After the killing, Meza withdrew the remaining funds from the bank account he shared with Merendino and sent a copy of the handwritten will (naming Meza as the beneficiary of a $1.3 million estate) to a lawyer in Texas to be probated. Meza googled news articles about the killing and reached out to an acquaintance to help back up a false alibi he had devised. Over the following weeks, Meza also began to express regret to Langston in a number of text messages. In one which he sent on May 30, he told Langston: "Ever since I did what I did, I'm not the same. And you have no idea how hard it is to try to pretend everything is fine. To pretend that I'm a normal person and have a normal life." Perhaps most significantly, Meza left a voicemail on Langston's cellphone, the functional equivalent of a confession to the murder, in which he told her:

> I honestly feel like shit with myself when I, ever since I did that, I hated myself more every day, every day. And I need to speak to someone, I

really do. I need help. Because I don't know how to cope. I really don't know how to get past this and move on. Every day of my life I wake up feeling guilty, I wake up hating myself for doing that. I had to, I had no choice, well, I had a choice, but *I did it because I wanted to*, *for my family*. But the price, uh, the price is high. More than I thought.

(emphasis added).

Meza does not seriously contest the substantial, independent, and credible evidence of guilt. Instead, he focuses on the effect the post-arrest statement may have had on whether Meza had the intent to kill Merendino when Meza crossed the border from the United States to Mexico. This argument is plainly without merit. The very facts that establish that Meza murdered Merendino compel the conclusion that he decided to kill Merendino before crossing back to Mexico.

Meza also argues that the trial prosecutor relied extensively on Meza's post-arrest statement to show such premeditation. At no point during the prosecutor's summation, however, does he address the mens rea element of the offense, except in responding to the defense's theory of the case (based on Meza's post-arrest statement) that, when he crossed the border, he intended only to steal Merendino's stereo equipment. The prosecutor pointed out that this theory did not make any sense because for over the preceding two years, "Merendino gave the defendant everything he wanted and more" and "this story about needing to steal at two o'clock in the morning . . . doesn't add up in light of all of the evidence." Indeed, to the extent that the prosecutor referenced the defendant's post-arrest exculpatory statement, it was

4

for the purposes of impeaching it by demonstrating its inconsistency with the other evidence in the case and to show that the defendant was a liar.

While it is true that the jury requested the clips and transcript of Meza's statement during its deliberations, this may have simply reflected the fact that the post-arrest statement was the only evidence that provided the basis for what passed for a defense theory. Defense counsel not only relied on the post-arrest statement in his summation, he played excerpts from it to undercut the showing of mens rea when Meza crossed the border. I have already alluded to the part of his statement relied upon by Meza's counsel that he crossed the border with the intent to steal Merendino's stereo equipment. At a later point in his summation, Meza's counsel actually played audio clips of the detective's interrogation to the jury in an effort to show that the detective and the FBI agent who accompanied him "didn't believe that David Meza intended to kill Jake Merendino at the time he crossed from the United States into Mexico. They didn't believe that. They believed that it was something that went wrong at the meeting. And if you agree with them, that's no conviction on Count 1." The jury may very well have been interested in going over this again.  In any event, Meza's assumptions on appeal about the jury's requests for evidence or the length of its deliberations are at best a matter of speculation, insufficient to overcome evidence so overwhelming that Meza's lawyer began his summation by saying: "We will agree he had motive. He had opportunity."

5

In sum, even if the *Miranda* warnings were somehow flawed, the admission of the post-arrest statement was harmless beyond a reasonable doubt.