### State v. Demyan
*[Cite as 3 AOA 51]*

*Case No. 2519*
*Clark County (2nd)*
*Decided May 25, 1990*

*David E. Smith, Assistant Prosecuting Attorney, 2 West Columbia, Springfield, Ohio 45502, Attorney for Plaintiff-Appellee.*

*Ralph R. Bove, Randall L. Porter, David Homer, 404 Barrington One, 13 Park Avenue West, Mansfield, Ohio 44902, Attorneys for Defendant-Appellant.*

WILSON, J.

After trial to a jury, Jane Demyan was found guilty of two counts of murder in violation of R.C.

2903.02. Demyan was sentenced to two consecutive terms of imprisonment of fifteen years to life with a recommendation that she receive treatment for mental health problems. This matter is now before the court on Demyan's timely notice of appeal from said conviction. Demyan asserts five assignments of error claiming that the trial court improperly excluded expert testimony as to her sanity, and that the findings that she was competent to stand trial and sane at the time of the alleged offenses were against the manifest weight of the evidence. Demyan is joined by the Ohio Public Defender who has filed an amicus curiae brief arguing that expert testimony which supports an accused's insanity defense cannot be constitutionally excluded merely because of defendant's refusal to cooperate with a court appointed expert. For reasons stated more fully below, we will reverse and remanded for a new trial.

Since Demyan's sole defense at trial was that she was legally insane, there is no dispute as to the facts in this matter.

Demyan was the divorced mother of two daughters, Amnee, age nine, and Chelsea, age four. Uncontradicted testimony given by friends and relatives indicated that Demyan underwent a drastic personality change in January of 1987. She became severely depressed and allowed her appearance and that of her daughters to deteriorate. Previously an outgoing person, Demyan became tense, distracted, and unable to initiate a conversation. She changed her hair style and clothing from neat and conservative to "wild." Even the children told their grandmother that "Mom's a little strange."

Most disturbing to those close to her was the fact that Demyan began to see common occurrences as omens of great religious significance. Several witnesses testified that Demyan would often have a glazed look in her eyes and begin to talk in a chanting monotone about such things as fighting demons, visiting Noah's Ark, and speaking to Jesus. In late April or early May of 1987, Demyan's relatives had a protracted discussion on her bizarre behavior, but could reach no consensus on how to deal with it.

At approximately 12:30 a.m. on May 21, 1987, Demyan drove to the house of her boyfriend, Scott Rebman. Chelsea and Amnee were in the backseat of the car in their pajamas. Demyan told Rebman that she was leaving and asking Rebman to accompany her. She demanded that he take no paper money but only gold, silver, and "minerals of the earth." Rebman got into the car, and they began to drive to Colorado. Rebman testified that along the way Demyan continuously referred to common events as "signs" of what she was to do, and seemed generally confused and incoherent. At 7:30 a.m., they stopped at a restaurant in Casey, Illinois. While Rebman was ordering breakfast, Demyan abandoned him and drove away with the girls. Rebman called the Illinois Highway Patrol and reported Demyan's strange behavior.

Demyan returned to Ohio, arriving in Springfield that same evening. She stopped at a bakery near Buck Creek. Witnesses in the bakery saw her lead her children toward the creek. A short time later she returned without her children. Demyan sat in her car in the bakery parking lot until 10:00 p.m. when the police were called. When an officer arrived on the scene she told him "I am Judas." Chelsea and Amnee were found drowned in Buck Creek.

Demyan was indicated on two counts of Aggravated Murder with death penalty specifications. She pled not guilty by reason of insanity. Her competency to stand trial was evaluated by Thomas Martin, a clinical psychologist, pursuant to court order. Martin informed the court that Demyan was competent. At that time Demyan presented no expert witnesses to contradict Martin, thus the trial court held that she was competent, and ordered an evaluation of her sanity at the time of the act.

Martin attempted on one occasion to evaluate Demyan but found her to be too disruptive, impulsive, and unpredictable to interview. Demyan was ordered to comply with court sponsored evaluations or face contempt proceedings. Martin tried to interview her again, but to no avail. After a hearing on the matter, Demyan was found in contempt and ordered that unless she cooperated with future evaluation attempts, she would not be allowed to present expert witnesses on the issue of insanity at trial. It is this sanction that is at the crux of this appeal.

After the contempt findings, the court ordered evaluations were conducted by Dr. Salah Samy, a psychiatrist. After a significant investment of time evaluating Demyan on an in-patient basis at Dayton Mental Health Center, Dr. Samy concluded that she was insane at the time of the act and incompetent to stand trial. Dr. Samy so informed the prosecutor, and the State moved for a second competency hearing.

The second competency hearing was held almost one year after the first one. The court appointed Dr. Samy was joined by two psychia-

trists privately retained by Demyan's parents, Dr. Joseph Trevino and Dr. Max Graves. Each of these men testified that Demyan was paranoid schizophrenic and was incompetent. The state's only witness was Bobbie Hopes, a psychologist employed by the Hamilton County Sheriff's Department. Hopes testified that she had seen Demyan one time for thirty minutes, found her to be uncooperative, and therefore concluded that she was competent based upon the legal presumption of sanity. Demyan's experts testified that Hope's methods were entirely inadequate, and that any "lack of cooperation" in such a brief and brusque interview was a manifestation of Demyan's paranoid mental disorder. Based upon this evidence the trial court again found Demyan to be competent and ordered that because of her continued lack of cooperation she could not present experts at trial. The record does not reflect that further attempts to evaluate Demyan were made by any court appointed experts, or that Demyan was provided an opportunity to purge her contempt.

This matter proceeded to trial with the sanctions in place. Demyan was allowed to present lay testimony from friends and relatives as to her bizarre behavior. Demyan was not allowed to present experts, but proffered the testimony of Dr. Samy, Dr. Graves, and Dr. Devinder Yakhmi, who all testified outside of the jury's hearing that Demyan was insane at the time of her children's deaths. The state was allowed to present the expert testimony of Martin to the jury in rebuttal to Demyan's lay witnesses.

The jury found Demyan not guilty of aggravated murder, but guilty of the lesser included offense of murder. After sentencing Demyan, the trial court recommended that she receive treatment for her mental disorder in prison.

For her first assignment of error, Demyan asserts that:
"THE TRIAL COURT ERRED PREJUDICIALLY BY RULING THAT APPELLANT WAS COMPETENT TO STAND TRIAL." We agree.

It goes without saying that the factual findings of a trial court are to be given great deference. *C.E. Morris Co.* v. *Foley Construction Co.* (1978), 54 Ohio St. 2d 279; *State* v. *Nicely* (1988), 39 Ohio St. 3d 147. However, this court has had occasion in the past to reverse findings on a defendant's mental condition when they are against the manifest weight of the evidence. *State* v. *Conn* (1982), 13 Ohio App. 3d 251. The defendant has the burden of proving by a preponderance of the evidence that she is incompetent,

R.C. 2945.7(A), but when reasonable minds cannot differ that this burden has been met, it is incumbent upon a reviewing court to reverse. *Conn, supra.*

The results of the first competency hearing, where only Martin testified, are not in dispute. Two weeks after the girls' deaths, Martin conducted a single interview lasting one hour and forty-five minutes while Demyan was in handcuffs and leg irons in the Clark County Jail. During the interview, Demyan varied her voice from soft whispers to loud shouts, crying, and singing. She stated that she wished to conduct her own defense *pro se* and forego the insanity defense. From this evaluation, the psychologist concluded that Demyan was competent *at that time.* However, one's competency to stand trial is not static, but may change over time. *Drope* v. *Missouri* (1975), 420 U.S. 162; *State* v. *Chapin* (1981), 67 Ohio St. 2d 437. Assuming that Demyan was competent too after the crime, as we must since no contradictory evidence was presented at the first hearing, it does not necessarily follow that she was competent at the time of the second hearing which occurred after one year spent predominantly in solitary confinement in the Clark County Jail. Thus, our review of this issue is limited to the second hearing.

Four experts testified at the second competency hearing. The only person who testified that Demyan was competent was the court appointed Hopes, who is the Director of Mental Health Services For the Hamilton County Sheriff's Department. Demyan proffered into the record a copy of complaints then pending before the State Board charging Hopes with four violations of the Rules of Professional Conduct for Psychologists. Also appointed by the court was Dr. Samy, Senior Forensic Psychiatrist at the Dayton Mental Health Center, who testified that Demyan was not competent then, but would probably become competent within one year if given proper therapy and medication. Two privately retained psychiatrists, Dr. Trevino and Dr. Graves agreed with Dr. Samy's evaluation.

Hopes testified that she only saw Demyan on one occasion for approximately thirty minutes. Hopes also testified that she had no prior notice that she was to evaluate Demyan; she merely arrived at the Dayton Mental Health Center, was told to see the patient and proceeded to the interview with little or no preparation. This is in stark contrast to the methods employed by the psychiatrist. The court appointed Dr. Samy interviewed Demyan six or more times during

her month long stay at the Dayton Mental Health Center. Dr. Trevino interviewed Demyan several times between February and April of 1988 with each session lasting over an hour and a half. Dr. Graves repeatedly interviewed not only Demyan, but also her family members from May to September of 1987. Each of the psychiatrists agreed that a single interview lasting only thirty minutes was grossly inadequate to evaluate Demyan. There was testimony that a rapport between patient and therapist must be established over time, and that a first interview has little value other than to begin to establish this relationship. There was also testimony that someone with paranoid schizophrenia could not be trusting enough to reveal any psychologically significant facts during a brief first meeting. Even Hopes admitted that "it would have been much more desirable to spend more time" with Demyan, but defended her thirty minute evaluating on the grounds that the patient "was becoming hostile, intimidating, and quite frightening." T. p. 88.

Hopes testified that when she began the interview Demyan was quiet, calm, soft-spoken, and polite. Hopes then informed Demyan that anything she said would not be confidential and demanded that she sign a statement to that effect. According to Hopes, Demyan "gently declined" and asked to see Dr. Samy. Hopes then "strongly suggested" that Demyan not decline to speak to her, causing Demyan to become hysterical. Dr. Trevino testified that such inappropriately aggressive behavior by Hopes toward a patient she knew had been diagnosed as a paranoid was inappropriate and destined to induce such a reaction. Hopes had Demyan removed to an adjacent room. She then asked an attendant if this was Demyan's typical behavior, and he responded that she was usually quiet and kept her room neat and clean. Demyan then burst back into the room and continued to scream at Hope. Hopes terminated the interview and did not attempt to see Demyan again. Based upon this evidence, Hopes concluded that Demyan was competent.

A person is incompetent to stand trial if he lacks the capacity to understand the nature and object of the proceedings against him and cannot assist his attorney in preparing his defense. *Drope, supra.* Hopes' method in evaluating these elements was quite different from that employed by the psychiatrists.

Hopes admitted that she never asked Demyan any questions designed to evaluate her ability to assist her attorney. T. (April 6 and 14, 1988), pp. 114-5. When asked if she had an opinion as to Demyan's ability to assist in her defense, Hopes responded:

"Okay. My opinion is that she is competent to stand trial, which would mean that she was capable of doing so, or at least that if she did not do so, it was not a direct result of her being mentally ill." T. (April 6 and 14, 1988), p. 139. Hopes' reasoning is obviously inverted. One is not capable of assisting in her defense because she is competent, but competent because she is capable of assisting in her defense. Hopes has first formed her conclusion and then reasoned that if the conclusion is true, then all of its supporting propositions must also be true. Even Hopes admits that Demyan repeatedly insisted upon going to trial immediately, conducting her own defense without an attorney, not presenting any witnesses in her behalf, and not proceeding with the insanity defense. It is uncontroverted that Demyan refused to speak to anyone, including her attorney, about her daughter's deaths. All three psychiatrists testified that this was a result of her paranoid schizophrenia. We fail to see how such a person could possibly assist in her defense.

Demyan's understanding of the nature of the trial is also highly questionable. She realizes that is generally concerns the "loss" of her children, but does not acknowledge their deaths. When Hopes inquired as to the purpose of the judge at trial, she responded that he was there to lie to her, to promise to let her speak and then later break his word. She told Hopes that the defense attorney would only be in court to hurt her by claiming she was "crazy." Each of the psychiatrists testified that these attitudes were a manifestation of her paranoia, wherein any attempt to try her is seem as merely arbitrary persecution.

We finds Hopes' own explanation of her assessment of Demyan's competency to be most enlightening.

"A. I'm going to try to answer what I think the question is. Again, before you read this, I believed the question was did I determine that she was feigning.

"Q. Uh-huh.
"A. And I said no. I can't conclusively decide whether she is feigning or whether she is mentally ill.

"Q. Um-hmm.
"A. All I said in the report was that that was one possibility and that there wasn't enough

evidence that I observed to support the assessment of her being actively mentally ill.

"Q. So what is the Judge to make of that?

"A. Well, my understanding of the situation is that a Defendant is to be presumed competent unless the evidence demonstrates otherwise; and since, at least in what I observed, I saw no evidence of mental illness, I was not convinced that there was a mental illness. I, however, don't believe that the evidence is strong enough for me to say that she does not have a mental illness. She may be feigning, she may not.

"Q. You cannot say that she does or does not have a mental illness.

"A. That's right. I can't with any, as I said in here, scientific certainty say that." T. (April 6 and 14), pp. 126-7.

We find two things to be gravely disturbing about this testimony. First, Hopes agrees with the three psychiatrists that she did not have enough evidence upon which to base her opinion within a reasonable scientific certainty. This being the case, her testimony must be given *very* little, if any, credence. An expert witness cannot testify that she does not have enough evidence upon which to base an opinion, and then proceed to voice an opinion despite this fact. Second, Hopes based her opinion upon the presumption of competency. Legal presumptions are for the courts, not psychologists. Moreover, we have clearly held that even a court cannot rest upon the presumption of competency alone. *Conn, supra.*

Three psychiatrists, one of who was appointed by the court, testified that Demyan was incompetent. Only the psychologist Hopes, whose testimony can at best be considered to have had minuscule value, opined that she was competent. Give this situation, we have no choice but to hold that the finding of competency was against the manifest weight of the evidence. We must remand this matter so that the trial court can determine Demyan's *current* competency; her competency in 1988 cannot be retried now. *Drope* at 183; *Pate* v. *Robinson* (1966), 383 U.S. 375, 386-7; *Dusky* v. *U.S.* (1959), 362 U.S. 402, 403. If and when Demyan is found to be competent, she must receive a new trial because the erroneous finding of competency so tainted the first trial that its results cannot be relied upon. *Id.*

For her second assignment of error Demyan asserts that:

"THE TRIAL COURT ERRED PREJUDICIALLY BY RULING THAT APPELLANT WAS IN CONTEMPT OF COURT."

We agree.

After the second competency hearing the trial court found Demyan in contempt of court for having failed to cooperate with Hopes. No further attempts were made by the court-appointed mental health professionals to evaluate Demyan, therefore she had no way to purge her contempt. This, coupled with the fact that she was being punished for her past failures to cooperate means that the contempt was criminal in nature. *Brown* v. *Executive 220, Inc.* (1980), 64 Ohio St. 2d 250; *Schrader* v. *Huff* (1983), 8 Ohio App. 3d 111. All due process rights apply in cases of criminal contempt. *Id.* Presumably, this also includes the special protections afforded by due process to incompetent defendants. It is also well established that due process will not allow a finding of contempt where the defendant is incapable of obeying the court's order. *Courtney* v. *Courtney* (1984), 16 Ohio App. 3d 329. Dr. Samy, Dr. Trevino, and Dr. Graves testified that Demyan's mental illness made her incapable of obeying the order to cooperate to the extent that she could neither control her emotional outbursts during interviews nor speak of events immediately surrounding the deaths of her daughters. As was seem *supra,* Hopes merely testified that she could not opine whether that was or was not the case. Thus, for virtually the same reasons that the finding of competency was against the manifest weight of the evidence, so too was the finding of contempt.

The court also notes that it is uncontroverted that Demyan cooperated with the court-appointed Dr. Samy. Demyan was not ordered to cooperate with Hopes in particular, but court sponsored evaluations in general. Under these circumstances we find it difficult to understand how a tirade during Hopes' brief and questionable interview constitutes disobeying the trial court's order that she be evaluated.

Demyan's second assignment of error will be sustained.

For her third assignment of error Demyan asserts that:

"THE TRIAL COURT ERRED PREJUDICIALLY BY RULING THAT APPELLANT WAS PRECLUDED FROM OFFERING EXPERT TESTIMONY AT TRIAL ON THE ISSUE OF HER MENTAL STATE IN ACCORDANCE WITH THE DEFENSE OF INSANITY OF THE OFFENSE OF AGGRAVATED MURDER."

She is joined in this argument by the Ohio Public Defender. We agree that this sanction was

inappropriate in the instant case. However, while we take a far more narrow approach than did the trial court, we do not agree that this sanction is *never* available against condemners.

Whether a trial court may exclude expert testimony because of defendant's failure to cooperate with court ordered evaluations appears to be a question of first instance in this state. It has, however, been addressed in the federal courts. Fed. Crim. R. 12.2(d) which has *not* been adopted in Ohio, states that "If there is a failure *** to submit to an examination when ordered under subdivision (c) of this rule [which is roughly analogous to R.C. 2945.39, under which Demyan was ordered to be examined], the court may exclude the testimony of any expert witness offered by the defendant on the issue of guilt." The rationale is that without this rule a defendant might be able to feign a mental disorder, assert an insanity defense, and prevent the state from inquiring into the validity of this defense by refusing to be examined by anyone but his own experts.

The trial court expressly relied upon Fed. Crim. R. 12.2 (d) in fashioning its sanction. Such a reliance raises several questions. First, despite the fact that this rule has been in effect in federal courts since 1975, Ohio has never seen fit to adopt any part of Crim. R. 12.2. This would seem to create at least some inference that this rather harsh sanction is not accepted in this state. Secondly, Demyan points out that the law surrounding the insanity defense is quite different in the federal system than in Ohio. Federal courts have long held that once a defendant makes a *prima facie* showing of insanity, the burden shifts to the government to proved beyond a reasonable doubt that he was sane at the time of the act. *Davis* v. *U.S.* (189), 160 U.S. 469. In Ohio however, the burden remains with the defendant to prove by a preponderance of the evidence that he was insane. *State* v. *State* (1969), 18 Ohio St. 2d 13. Demyan argues that while the government might need the extra protection of Fed. Crim. R. 12.2(d) in the federal system, in Ohio the state's interests are more than adequately protected by the difference in the burdens of proof. Finally, the sanctions of the Fed. Crim. R. 12.2(d) seem to have only been applied where a defendant who was not in custody refused to even meet with the psychiatrist at all, not as in the instant case where the defendant spoke with the analysts but behaved in a way that was deemed "uncooperative." See *e.g., U.S.* v. *Wagner* (9th Cir. 1987), 834 F. 2d 1474; *U.S.* v. *Campbell* (6th Cir. 1982), 675

F. 2d 815; *State ex rel Johnson* v. Richardson (1976), 276 Or. 325; *Lee* v. *County Court of Eric County* (1971), 318 NYS 2d 705. The focus of Fed. Crim. R. 12.2(d) is to prevent defendants from springing a surprise insanity defense on the government without proper notice. Notes of Advisory Committee; *U.S.* v. *Veatch* (9th Cir., 1981), 674 F. 2d 1217; *U.S.* v. *McLernon* (6th Cir., 1984), 746 F. 2d 1098. No question of insufficient notice exists in the instant matter.

It must be remembered, however, that the trial court grounded its decision in a finding of contempt, referring to Fed. Crim. R. 12.2(d) only for guidance, not authority. Courts have an inherent power to punish contempts that exists independently from express constitutional provisions or legislative enactment. *Cincinnati* v. *Cincinnati Dist. Council 51* (1973), 35 Ohio St. 2d 197. Furthermore, Demyan was under a court order to cooperate with appointed psychiatrists and psychologists. Such an order is authorized by R. C. 2945.39. Therefore, assuming that she disobeyed this lawful order of the court, she would have been in contempt by virtue of R. C. 2705.02(A). Simply because the trial court modeled the sanction after a procedural rule that has not been adopted in this state does not necessarily make it invalid. Courts are granted broad discretion in this area and may impose any penalty that is reasonably commensurate with the gravity of the offense. *State* v. *Kilbane* (1980), 61 Ohio St. 2d 201; *State* v. *Local Union 5760* (1961), 172 Ohio St. 75. Given that exclusion of experts on criminal insanity because of defendant's refusal to submit to examinations is permitted by the federal government and several of our sister states, we cannot say that the sanction is unreasonable *per se*.

The state has a legitimate interest in seeking the exclusion of expert witnesses in certain situations. It would not further the interest of justice to allow a defendant to claim that he was insane and then deprive the state of the only effective means of testing the validity of that defense. Information relating to his own mental health is uniquely in the defendant's sole possession. It can only be assessed and examined by qualified experts who have access to the defendant. In this sense, the state of the defendant's mental condition becomes discoverable material once the insanity defense is raised. If a defendant refuses to allow the state access to discoverable material the court may, in its discretion, "prohibit the party from introducing in evidence the material not disclosed [defendant's mental condi-

tion], or it may make such other order as it deems just under the circumstances." Crim. R. 16(E)(3).

For these reasons, we hold that a court may exclude expert testimony on the issue of sanity where the contemnor refused to submit to examinations properly ordered by the court. However, even federal courts recognize that exclusion is a "drastic sanction." *U.S.* v. *Staggs* (7th Cir., 1977), 553 F. 2d 1073, 1077. As such, it should only be sparingly imposed. There are also significant constitutional considerations which limit the circumstances under which it may be imposed. It is because of these considerations that it was error to exclude Demyan's expert witnesses in the instant case.

The U.S. Supreme Court has stated that once a defendant raises the defense of insanity, "due process requires access to a psychiatric examination on relevant issues, *to the testimony of the psychiatrist*, and to assistance in preparation at the sentencing phase." *Ake* v. *Oklahoma* (1985), 470 U.S. 68, 84. (Emphasis added). Thus, Demyan would seem to have had a right not only to be examined, but also to have her examiners testify in her behalf at trial. If is not sufficient that the trial court allowed lay testimony in support of Demyan. The U.S. Supreme Court has emphatically stated that when criminal insanity is at issue, lay testimony can never be an adequate substitute for the expert opinion of a mental health professional. *Id.* at 80-82.

The Sixth Amendment to the U.S. Constitution, applied to the states through the Fourteenth Amendment, provides defendants with a right to compulsory process. This means that the accused in a criminal case has a constitutional right to present any testimony that is relevant to his defense. *Washington* v. *Texas* (1967), 388 U.S. 14. There can be no doubt that the testimony of three psychiatrists is relevant in a case where the sole defense is insanity. The state does not argue, nor could it, that the testimony was excludable under Evid. R. 402 or 403. The sole basis was Demyan's "uncooperative" behavior.

It is clear that Demyan had several substantial rights to present the testimony in question. However, our analysis must not end here. Any constitutional right, even rights as compelling and significant as those involved in the instant matter, may be waived by the defendant. *Brookhart* v. *Janis* (1966), 384 U.S. 1. Thus, the exclusion of expert witnesses in the manner employed by the trial court is permissible, but *only* if the defendant has made a proper waiver of

his relevant due process and compulsory process rights.

The U.S. Supreme Court has held that:

"Waivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences." *Brady* v. *U.S.* (1970), 397 U.S. 742, 748. This standard is recognized in Ohio. *State* v. *Harris* (1976), 48 Ohio St. 2d 351.

The obvious question that this raises is whether Demyan's uncooperative behavior was a voluntary, knowing, and intelligent act. If these acts were a manifestation of her mental illness, then they necessarily were not of this character, and could not have been a basis for waiver. Furthermore, there is a strong legal presumption that Demyan did not waive her rights. *Brookhart, supra; Glasser* v. *U.S.* (1941), 315 U.S. 60; *Johnson* v. *Zerbst* (1937), 304 U.S. 458; *State* v. *Simpson* (1981), 2 Ohio App. 3d 41. Therefore, the burden rests upon the state to prove that the elements of waiver have been met. Although this requires the state to prove that Demyan's lack of cooperation is not a result of mental illness, it does not cause a shift in the burden of proof. Demyan must still prove that she is incompetent and was insane, but the state must prove that she has waived her constitutional right to present expert witnesses on her insanity defense. This burden may be met in several ways. The state may present lay testimony that the defendant is voluntarily and knowingly refusing to be examined; for example, a witness who heard the defendant admit that he was going to "play crazy" to avoid punishment. *Strickland* v. *Georgia* (1987), 257 Ga. 230. A psychiatrist may also testify that due to all of the surrounding circumstances, defendant's behavior, and the manner in which he refuses to cooperate, he is of the opinion that he is feigning a metal disorder. *State* v. *Marshall* (1984), 15 Ohio App. 3d 105. Thus, the interest of the state in preventing feigned insanity defenses is protected, while still guaranteeing the constitutional rights of mentally ill defendants. This balancing seen especially appropriate when one considers that it is well settled that the state's interest in securing a conviction is greatly outweighed by its interest in providing a fair and accurate adjudication of the issue of insanity. *(AKE* at 79.)

The state clearly failed to meet this burden in the instant case. As was explained *supra,* the trial court heard the testimony of three psychiatrists who said that Demyan's lack of cooperation

was caused by her mental disorder, and that she was not feigning these symptoms. The state's only rebuttal to this was Hopes' testimony that she could not tell whether or not Demyan was feigning. There was no evidence that Demyan had voluntarily, knowingly, and intelligently waived her due process rights. Therefore, it was error to excluded expert testimony on the issue of insanity, and Demyan's third assignment of error is sustained to that extent.

We hold that a court may exclude the testimony of expert witnesses on the issue of sanity as sanction for contempt due to defendant's refusal to submit to court ordered examination, if and only if the state can establish that the accused is voluntarily, knowingly, and intelligently failing to cooperate and is sufficiently aware of the likely consequences of such actions. We note that nothing in this opinion affects the trial court's ability to impose a sanction short of exclusion of witnesses for a defendant's refusal to submit to properly ordered examinations.

For her fourth assignment of error, Demyan asserts that:

"THE TRIAL COURT ERRED PREJUDICIALLY BY RULING THAT THE STATE COULD INTRODUCE EXPERT TESTIMONY ON THE ISSUE OF APPELLANT'S MENTAL CONDITION SUBSEQUENT TO THE TIME OF THE ALLEGED OFFENSE AS REBUTTAL TO DEFENSE TESTIMONY BY LAY WITNESSES CONCERNING APPELLANT'S BEHAVIOR PRIOR TO THE TIME OF THE ALLEGED OFFENSE, WITHOUT ALLOWING EXPERT TESTIMONY BY DEFENSE WITNESSES ON THE ISSUE OF APPELLANT'S MENTAL CONDITION."

Demyan advances two arguments in support of this proposition. We accept neither.

Demyan's first argument is that if she prohibited from presenting experts on the issue of insanity, the state should also be similarly constrained. Assuming that a defendant were properly prevented from introducing such witnesses, we see no reason why the state must also suffer such sanctions. The mere fact that both parties are participating in the same law suit does not mean that *both* must be punished if *one* is found in contempt of court. The testimony of Martin, the first psychologist who saw Demyan, was admissible as rebuttal to the lay testimony she presented as to sanity.

Demyan's second argument is that even if the state could introduce expert testimony, they could not use the testimony of Martin, because his only exposure to Demyan was through court ordered examinations. Demyan argues that Martin is barred from testifying by R.C. 2945.39(D), which reads:

"No statement made by a defendant in an examination or hearing relating to his mental condition at the time of the commission of an offense shall be used in evidence against him on the issue of guilt in any criminal action."

Although this argument might appear to have some merit at first glance, the Supreme Court has interpreted this statue to mean that:

"A defendant's statements made in the course of a court-ordered psychological examination may be used to refute his assertion of mental incapacity, but may not be used to show that he committed the acts constituting the offense." *State* v. *Cooey* (1989), 46 Ohio St. 3d 20, syllabus 2. Martin testified only to refute her assertion of mental incapacity. Indeed he could not have testified as to the acts constituting offense because Demyan refused to speak to him or anyone else about those acts, thus giving rise to the contempt finding. Therefore, the fourth assignment of error is without merit.

Demyan asserts in her fifth assignment of error that:

"THE JURY VERDICT IS CONTRARY TO THE MANIFEST WEIGHT OF THE EVIDENCE ON THE ISSUE OF APPELLANT'S INSANITY DEFENSE."

The evidence upon which the jury based its verdict was fatally flawed in that they did not hear the testimony of Dr. Samy, Dr. Graves, and Dr. Yakhmi. We will not speculate as to what the verdict would have been had the jury heard all of the relevant evidence.

Demyan's fourth and fifth assignments of error are found to be not well taken and will be overruled. The remainder of the assignments are found to be well taken and will be sustained. For the reasons stated in our resolution of the first three assignments, judgment of the trial court is Reversed and this matter is remanded for a reevaluation of Demyan's *present* competency to stand trial. If and when she is adjudged competent, a new trial shall proceed in accordance with law.

*Judgment affirmed in part,*
*reversed in part, and*
*cause remanded*

BROGAN, J., and FAIN, J., concur.